JOHN W. HUGHES AND JOHN S. ECK v. CHARLES H. TANNER.

*Logs and logging—Lien—Waiver.*

| 96 | 113 |
| 111 | 525 |
| 96 | 113 |
| 116 | 254 |
| 96 | 113 |
| 120 | 65 |
| 96 | 113 |
| 152 | 112 |

1. In the absence of a reservation in a sawing contract of the right to ship the lumber before payment of the saw bill, the shipment of a portion of the lumber without protest will not prevent the contractor from claiming a lien upon the remainder for the whole saw bill.

2. The acceptance of time drafts on account of the amount due on a sawing contract will not operate to discharge the lien of the contractor unless received as payment, and then only *pro tanto;* citing *Craddock v. Dwight*, 85 Mich. 587, 591.

3. Where the purchasers of a portion of the lumber covered by a sawing contract know that the lumber is in the possession of the contractor, and is being sawed by him, and the only knowledge he has of the sale is the fact that the initials of their names are placed upon certain piles of the lumber, and that he sees one of the purchasers at the mill while the sale is being negotiated, no such sale, delivery, transfer of title, or payment in the contractor's presence is shown as to make it his duty to assert his lien.

Error to Iosco. (Simpson, J.) Argued April 20, 1893. Decided June 16, 1893.

Replevin. Plaintiffs bring error. Affirmed. The facts are stated in the opinion.

*M. J. Connine,* for appellants, contended:

1. If the contract and course of dealing are inconsistent with a lien, none arises (*Randel v. Brown*, 2 How. 406), as by giving credit beyond the time when the property is to pass out of the possession of the claimant, or by a particular mode of payment; citing 1 Jones, Liens. §§ 322, 1002; *Trust v. Pirsson*, 1 Hilt. 292; *Fieldings v. Mills*, 2 Bosw. 489.

2. The contract, and the course of dealing under it, were radically inconsistent with a lien, and defendant has waived his lien by

his conduct with plaintiffs. The contract itself is inconsistent with a lien, because, according to its terms, payment for the sawing was to be made at stated times, meantime permitting the Potts Lumber Company to remove all the lumber prior to the time of payment if it chose, and still further providing that defendant should wait until fall for about half of his pay, at which time all the lumber might be gone. He was bound to deliver as fast as the Potts Lumber Company saw fit to take it, and an unconditional agreement to deliver is antagonistic to continual possession, which is the foundation of a common-law lien; citing *Chadwick v. Broadwell*, 27 Mich. 6; *McMaster v. Merrick*, 41 Id. 505; *DeWitt v. Prescott*, 51 Id. 304; *Smith v. Greenop*, 60 Id. 68; *Tyler v. Lumber Co.*, 78 Id. 81.

3. Applying the payments to the lumber cut from month to month, defendant has received more than enough to pay him for all the lumber cut up to August 1, 1890, which was the date when the last of plaintiffs' lumber was cut and piled, and, as between defendant and plaintiffs, who are third parties, and who have purchased and paid full value, the law ought to apply these payments to the lumber first cut; citing *McMaster v. Merrick*, 41 Mich. 512; *Youmans v. Heartt*, 34 Id. 397.

*O. E. M'Cutcheon* (*Forrest & M'Cutcheon*, of counsel), for defendant.

McGRATH, J.   Plaintiffs bring replevin for a quantity of lumber, upon which defendant claims a lien for the saw bill.

In the spring of 1890, defendant, who was the owner of a saw-mill and the docks at Oscoda from which the lumber was replevied, entered into a verbal contract with the Potts Lumber Company to saw logs for the company for that season, at $2.50 per thousand. The agent of the Potts Lumber Company testified that—

" The contract was that he was to have $2.50 for sawing and piling it on the docks, where the boats could get it, and, if he was compelled to put any on the shore, he had to forward it at his own expense when we needed it. There was no particular quantity mentioned that he was to cut. He was to cut all we had, and we were to give him all he could cut. He was to get in cash whatever

the amount of his pay-roll would be every two weeks. He said he did not think it would amount to much more than half what the bill called for, and, with the balance, he did not need the money; that we could settle any time in the fall with 60-day paper. He was to have enough every two weeks to pay his expenses, and the balance was to be settled for in the fall with 60-day paper. It was proposed to reach the amount in the fall that he had cut, by estimate."

The defendant insisted that the fall settlement was to be in cash, and that, as the lumber was shipped, he was to be paid in full for the saw bill. As these payments were made, they were credited to the Potts Lumber Company, and the saw bill was charged up as the lumber was shipped.

Under this contract, defendant cut and piled about 9,000,000 feet of lumber during the season of 1890. About half of this lumber was shipped away. The lumber company failed in November, 1890. No settlement had been had between the parties. The total amount of the saw bill was upwards of $22,000. Defendant had received $7,247.05, and the further amount of $4,000 in drafts which had not been paid, leaving a balance unpaid at the close of the year of $14,774.77. This amount was reduced by payments by parties claiming interests in the lumber to $6,661. As the lumber was cut, it was sorted and piled, as directed by the lumber company, and each pile, as completed, was marked by the lumber company with the date, and the initials "J. E. P." The payments made during the season were by 30 or 60 day drafts.

In the latter part of July, 1890, plaintiffs claim to have purchased certain piles of this lumber, which were at the time estimated at between 1,200,000 and 1,300,000 feet. It was agreed that the mill culls were to be $6 per thousand; the double X, including the 12-inch, was to be $10 per thousand; and the wide was to be $12 per thousand. It was to be inspected and delivered afterwards, and the

price was agreed upon, subject to inspection as it was loaded. Three hundred thousand feet of this lumber was taken away. Plaintiffs gave their paper for the full amount that was claimed upon the estimate. One of the plaintiffs testified that—

"They [the lumber company] wanted that amount of paper, and I advanced it. I did not intend to advance them any more than I believed there was in my judgment. If there had been any difference, I assumed that the difference was to be adjusted on inspection. They [the lumber company, before inspection] utterly abandoned the lumber."

These piles of lumber, so claimed to have been sold to plaintiffs, were marked by the lumber company with the initials "J. W. H." One or more witnesses testified that the word "sold" was added, but others testified that it was not.

The question as to what the contract between defendant and the lumber company really was, was for the jury. The final balance was to be made upon estimates. This contract did not necessarily contemplate the shipment of all of the lumber before final settlement. If, as defendant claimed, the basis of the saw bill, prior to the final settlement at the close of the season, was to be the lumber scale upon shipment, it is immaterial whether all or any part of the lumber was to be shipped during the season; for, in any event, the saw bill as to the lumber shipped was to be paid as it was shipped. The contract stated by the company's agent makes no reference to the payment of the saw bill upon the lumber actually scaled and shipped. The defendant denies that any time was to be given at the close of the season. That question was for the jury. Upon defendant's theory, all of the lumber was to remain on his docks, in his possession, until the saw bill was paid. Such a contract was not inconsistent with the right to claim a lien.

In the absence of a right expressly reserved to ship before payment of the saw bill, the fact that lumber was shipped away without protest would not take away the right to assert a lien upon what remained. The right to assert a lien upon what remained was not affected by the release of what was shipped. The contract was entire and continuing. It covered the whole season's cut. What lumber remained was subject to lien for the whole saw bill. As was said by Lord Ellenborough in *Blake v. Nicholson*, 3 Maule & S. 167:

"I think the defendant had a lien for the whole balance, the work being an entire work, in the course of prosecution, upon the same principle that a tailor who is employed to make a suit of clothes has a lien for the whole price upon any part of them."

The fact that, as the lumber was piled, it was marked with the initials "J. E. P.," did not take it out of defendant's possession. The title to this lumber was in the lumber company. Defendant was sawing other lumber. Considerable of this very lumber was piled on the bank or on the docks at shallow water, and, under the contract, defendant had a duty yet to be performed respecting it. The lumber company gave directions how it was to be piled, but defendant directed where it was to be piled. Neither party regarded the marking as having any significance as a delivery or transfer of possession.

The receipt of the dishonored paper would not operate to discharge the lien unless received as payment (*Craddock v. Dwight*, 85 Mich. 587, 591), and then only *pro tanto*. Defendant claimed only $2.50 per thousand upon plaintiff's lumber, and, after deducting the amount of these unpaid drafts, the amount remaining due defendant exceeded the judgment.

Whether, as between the lumber company and plaintiffs, there was a transfer of the title even, may well be doubted,

but there was clearly no such participation or knowledge on the part of defendant as would operate to estop him from asserting his lien. Plaintiffs were doing business at Toledo, Ohio. One of them visited the mill, looked over the lumber, returned to Toledo, and afterwards communicated their acceptance of the proposition made to the lumber company. No knowledge of their acceptance, of the terms of the contract, of the time or place of delivery, was brought home to defendant. The only undisputed testimony tending to bring the knowledge of the sale to defendant was the fact that the initials were placed upon these piles of lumber, and the further fact that defendant had seen one of the plaintiffs at the mill while the sale was being negotiated. There was no such sale, delivery, transfer of title, or payment in defendant's presence as made it his duty to assert his lien. Plaintiffs knew that the lumber was in defendant's possession, and was being sawed by him. Plaintiffs cannot be said to have been ignorant of defendant's rights. He had not misled them even by silence.

It is insisted that, inasmuch as the total amount paid by the lumber company, including the $4,000 in paper which had not been paid, was sufficient to pay the saw bill for all lumber cut prior to August 1, such payments should have been applied to liquidate that part of the saw bill first earned. The contract being entire, any part was subject to lien for work done on any other part. *Craddock v. Dwight, supra.*

We find no prejudicial error in the record, and the judgment is affirmed.

The other Justices concurred.