H. C. AKELEY v. MISSISSIPPI & RUM RIVER BOOM COMPANY.[1]

Upon Reargument, May 11,[2] 1896.

Nos. 9806—(318[3]—214[4]).

**Logs—Boom Charges—Lien.**

*Held*, that defendant's lien for boom charges on logs in its possession is valid, as against bona fide purchasers, although not recorded in the office of the surveyor general of logs and lumber.

**Same—Single Bailment.**

*Held*, that, under the facts, all the logs delivered to the defendant constituted but a single bailment, although not to be all driven to the place of destination and delivered to the owner at one time.

**Same—Partial Delivery.**

The lien given by defendant's charter (Sp. Laws 1867, c. 134, § 12), on logs remaining in its possession, for charges on logs previously delivered, is not a general one, on all logs of the same owner, but only a particular one, on logs of the same mark.

[1] Reported in 67 N. W. 208.

[2] On February 6, 1896, the following opinion was filed:

MITCHELL, J. This case is controlled by that of Clough v. Same Defendant (supra, p. 87), the only difference in the facts being that in this case the logs in question had been sold by Clough Bros. to the plaintiff, Akeley. Judgment reversed, and cause remanded, with directions to enter judgment for the plaintiff.

[3] October, 1895, term calendar.      [4] April, 1896, term calendar.

**Same—Waiver.**

While defendant may deliver a part of a lot of logs, and still retain its lien on the remainder for all its charges on the whole lot, yet this lien will be waived by any contract or course of conduct inconsistent with the existence of a lien, and, if once waived, is lost forever.

**Same.**

*Held*, that the course of conduct on part of the defendant in this case amounted to a waiver of any lien on the logs remaining in its possession for its charges on logs previously delivered.

Case submitted to the district court for Hennepin county upon an agreed statement of facts, pursuant to G. S. 1894, §§ 6083, 6084. The facts are stated in the opinion. The court, Belden, J., found as conclusions of law that defendant was entitled to enforce a lien paramount to the claim of plaintiff against the logs of each mark which it had seized and taken possession of, on account of unpaid boomage charges against logs of the same marks delivered to N. P. Clarke & Co. in the year 1894, for which charges the notes mentioned in the opinion were given, and that defendant was entitled to possession of the logs in controversy, and ordered judgment accordingly. From a judgment entered in pursuance of such order in favor of defendant, plaintiff appealed. Reversed.

*Taylor, Calhoun & Rhodes*, for appellant.

*John B. Atwater*, for respondent.

MITCHELL, J. This case was submitted on briefs at the same time that the case of Clough v. Mississippi & R. R. B. Co., supra, p. 87, 66 N. W. 200, was argued orally; and we were led by what was said by counsel, or rather, perhaps, by what they omitted to say, to assume, without careful examination of the record, that the facts and the legal questions involved were the same in both cases. Upon discovering our mistake, we ordered a reargument on our own motion.

The essential difference between the two cases consists in the fact that in this case the logs in controversy, as well as those previously delivered in 1894, were all the absolute property of N. P. Clarke & Co.; the log marks being recorded in their name, as their property. The agreed facts are substantially as follows: N. P. Clarke & Co. were the owners of a large amount of logs, including the logs in controversy, and bearing the same log mark, and also a large quan-

tity of other logs bearing other marks. During the year 1894 these logs were all in the possession of the defendant, and were being driven by it down the Mississippi river to its boom in Minneapolis, and there, from time to time, turned out and delivered to N. P. Clarke & Co. Over 60,000,000 feet, of which over 23,000,000 feet bore the same mark as the logs in controversy, were thus turned out and delivered in the season of 1894, leaving a large amount bearing these various marks still in the possession of the defendant. The aggregate boom charges of the defendant (which were at a uniform rate per thousand feet) on all the logs thus delivered in 1894 amounted to over $34,000.

The manner of dealing between N. P. Clarke & Co. and the defendant was as stated in the Clough Case, viz.: That at the end of each month during the season the defendant rendered to N. P. Clarke & Co. a statement of the amount of its charges for the logs turned out during the month; the number of feet of the logs of each mark being separately specified, and the total amount of the charges upon all of the logs stated in a single item at the end of the account. When a monthly statement was rendered, N. P. Clarke & Co. gave the defendant their negotiable promissory note for the amount, payable in three months after date; and thereupon the defendant would receipt the bill and deliver it to N. P. Clarke & Co. At the time of giving and receiving these notes, nothing was said as to the effect which they might have upon their respective rights in regard to the matters here in controversy; but the defendant did not intend, by receiving the notes, to relinquish any claim of lien which it might have under its charter "against said mark of logs," but no communication of such intention was given to N. P. Clarke & Co. From time to time, over half of these notes were transferred by defendant to third parties, and paid at maturity by the makers. The remainder of the notes were renewed from time to time by N. P. Clarke & Co. giving the defendant similar three-months notes for the respective amounts of the originals. All of these renewal notes which have not been paid, amounting to $10,000, are still held by the defendant, and were overdue and unpaid on May 15, 1895.

On April 25, 1895, N. P. Clarke & Co., for a valuable consideration, executed to plaintiff a bill of sale of the logs in controversy, which

were still in the possession of the defendant, in its boom, and which bore the same mark as part of the logs turned out and delivered in 1894, as already stated. This bill of sale was duly recorded the next day in the office of the surveyor general of logs and lumber. When plaintiff purchased the logs, he had no knowledge that the boom charges on logs delivered in 1894 had not been fully paid. May 4, 1895, N. P. Clarke & Co., being insolvent, made an assignment of their property for the benefit of their creditors. May 15 defendant seized a quantity of the logs bought by plaintiff, and which remained in its possession in its boom, ready for delivery; claiming to have a lien on them, under its charter, for the proper proportion of its unpaid boom charges for logs turned out and delivered to N. P. Clarke & Co. in 1894, and for which the notes then due had been given. It does not appear when the logs thus seized arrived in the boom at Minneapolis, and were ready for delivery. For anything that appears in the agreed state of facts, they may have been already there before the notes now due and unpaid were given. Neither does it appear when these notes fell due, nor when they, or the notes of which they were renewals, were given. While it is not expressly so stated in the agreed facts, it may be assumed, from the nature of the business, that the logs that were being driven by the defendant for N. P. Clarke & Co. did not, and were not expected to, all arrive in the boom at Minneapolis and become ready for delivery at one time, but from time to time, and that, as soon as they thus arrived, they were deliverable to the owners upon demand, and payment of boom charges.

The question is whether, upon the facts, the defendant has a lien on the logs so seized, paramount to plaintiff's title, for any part of its unpaid fees on logs delivered to N. P. Clarke & Co. in 1894. The clause of its charter under which defendant claims a lien is Sp. Laws 1867, c. 134, § 12, which provides that it "shall have a lien and property in all such logs or other timber, so far as to enable it to take, scale and retain a sufficient number or quantity of said logs or other timber to pay the boomage and charges due on the same and also all charges due on logs or timber of the same mark that may have been previously delivered."

1. There is nothing in the point made by plaintiff that defendant's lien, if any existed, was void, as against an innocent purchaser, un-

der G. S. 1894, §§ 2405, 2408, because not recorded. The statute cited has no application to a case like the present, where the lien is based on actual possession of the property. Possession, as notice of a party's right in the property, is equivalent to actual notice. This statement of the law, of course, does not apply where the conduct of the party has been such as to equitably estop him from claiming a lien.

2. Defendant's right of lien, except so far as affected by statute, is analogous to that of a common carrier by vessel or rail; and it is a familiar rule that the lien of a carrier is a specific or particular lien, for charges and advances upon the particular goods upon which it is claimed, and not a general lien, upon any goods that may come into his possession, for a general balance which the owner may owe him on other accounts. Plaintiff invokes this rule as applicable to this case, because, inasmuch as the logs would not, in the natural course of business, all arrive in the boom at Minneapolis, or be deliverable there, at the same time, they constituted different and distinct bailments, and not a single transaction. Assuming, without deciding, that this general rule is applicable to the defendant, under its charter, still, under the facts, all the logs constituted but a single bailment, within the rule. They were all delivered to the defendant, in the same season, by the same party, as the property of the same owner, for the same purpose, and to be delivered at the same place, to the same consignee. The only distinction between this and the ordinary consignment of property to a carrier is that, from the very nature of the business, the logs could not all arrive at their destination, ready for delivery, at the same time, and perhaps not during the same season. Any legal distinction based on that bare fact would be merely fanciful.

3. There are other grounds, however, upon which it must be held that the agreed facts fail to show that defendant has any lien for any part of its charges for logs delivered in 1894. It is stipulated that plaintiff was entitled to the possession of the logs in controversy, unless defendant was entitled to a lien upon the same for its boomage charges, or some part thereof, on account of logs of the same mark delivered and turned out to N. P. Clarke & Co. during the season of 1894. Therefore, to entitle defendant to recover, the

facts must show affirmatively that it has such a lien for at least some amount.

A lien is lost or waived if the lienable claim is so mingled and intermixed with nonlienable claims that it is impossible to distinguish between the two. Defendant's right of lien is specific and particular, and not general. Where it delivers a part of a lot of logs, bearing a certain mark, without payment of its charges, its lien for the charges on the logs thus delivered is not on all the logs of the same owner remaining in its possession, but only on those "of the same mark." The language of its charter is explicit on that point. The defendant itself has proceeded on this theory, for it claims a lien on the logs in controversy, not for the whole amount of its unpaid charges, but only for the proportion thereof which it assumes is properly chargeable to logs of this particular mark. It requires no argument to show that it does not appear from the agreed facts that these unpaid notes include one dollar of charges on logs of the same mark as those in controversy. It does not appear for what months these notes, or those of which they are renewals, were given, or that any logs of this mark were delivered during the months represented by these notes. For anything that appears, every dollar of charges on logs of this mark turned out in 1894 may have been included in the notes for $24,000, which have been already paid.

4. It may be, as suggested on the argument, that this is merely an oversight in framing the statement of agreed facts, which could be remedied on another trial. We therefore proceed to consider another ground upon which we think it must be held that defendant has lost or waived its lien on these logs for any part of its charges on those delivered in 1894.

It is undoubtedly well settled that the mere fact that a carrier delivers a part of a bailment without payment of his charges does not constitute a waiver of his lien on the remainder for his charges on the whole bailment. The charter of the defendant makes express provision to that effect as to logs of the same mark. But all the authorities are agreed that a lien is waived or lost by any contract or course of conduct inconsistent with the existence of a lien. A common example of such a waiver is where credit is

given by contract to the shipper for the price of transportation beyond the time when the property is to be delivered and placed out of the carrier's control. The Bird of Paradise, 5 Wall. 545; Hutchinson, Carr. §§ 483-487. And if the lien is thus waived the insolvency of the shipper, or his default in payment at the expiration of the credit, occurring while the goods still remain in the possession of the carrier, will not reinstate it. The Bird of Paradise, supra; Au Sable R. B. Co. v. Sanborn, 36 Mich. 358. The law seems to be otherwise in the case of a vendor who sells on credit. Crummey v. Raudenbush, 55 Minn. 426, 56 N. W. 1113. Why this distinction is made in favor of a vendor may not be entirely clear on principle, although it is usually placed upon the ground of the vendor's original ownership of the property. But the law seems to be well settled as we have stated it.

Recurring now to the facts of this case, and keeping in mind that defendant's lien for charges on logs turned out without payment of their proper charges was only a specific one on the remaining logs of the same mark; that presumably, in the natural course of business, logs were arriving from time to time in the boom in Minneapolis, ready for delivery; that such logs were deliverable to the owner on demand, and were being demanded from time to time as the owner needed them; and that the logs in this instance bore a great many different marks,—it appears to us that the uniform course of dealing on part of the defendant was utterly inconsistent with the retention by it of any lien on logs remaining in its possession for charges on the logs turned out, and for which it extended credit to N. P. Clarke & Co. In the first place, at the end of each month defendant accepted one note for all the charges on all logs of all marks turned out during that month, without regard to how much was due for charges on logs of any particular mark. In the next place, for each month's charges it gave a uniform credit of three months, without any regard to how many logs might be called for during that time, or how many would remain undelivered at the expiration of that period. The same was true of the renewals or extensions of credit when the original notes fell due from time to time. These notes were negotiable, and the defendant was in the habit of selling them in the market, apparently as its financial in-

terests required, and without any reference to the existence of any supposed lien to secure their payment. It does not appear that there was any agreement that all the logs remaining in its possession should be retained as security for the payment of the notes at maturity. In fact, the course of dealing negatives the existence of any such agreement or understanding. Hence N. P. Clarke & Co. must have had the right to demand and receive at any time any logs ready for delivery, subject to the payment only of any sum then due. If they had demanded any logs before any of these notes fell due, they would have had a right to receive and remove them without paying anything except the proper charges on the logs thus demanded. The very existence of this right is inconsistent with the existence of any lien for charges on logs previously delivered; and the fact, if it be a fact, that the logs in controversy were not demanded until some of these notes were overdue, could not have. the effect of reviving the lien, for a lien once waived is permanently lost.

If there could be any doubt of this as between the defendant and Clarke & Co., it would seem that there ought not to be any as between the defendant and an innocent purchaser. The case of Au Sable R. B. Co. v. Sanborn, supra, would seem to be especially in point. Neither do we think that Hughes v. Tanner, 96 Mich. 113, 55 N. W. 661, relied on by defendant, is at all inconsistent with this view, when the facts, as they might have been, and presumably were, found by the jury, are fully examined, and especially the fact, as claimed by the defendant, that the agreement was that, notwithstanding the acceptance of time drafts, all the lumber was to remain on his docks, in his possession, until the saw bill was paid. The result arrived at in this case works no injustice to the defendant. Undoubtedly, it may, under its charter, deliver a part of a lot of logs without waiving its lien on the remainder for its charges on those delivered; but, if it sees fit to deliver logs without requiring payment of its charges on delivery, it is a very easy matter to refrain from a course of business inconsistent with the continued existence of a lien.

Judgment reversed, and cause remanded, with directions to the court below to order judgment for the plaintiff for the possession of the property.

CANTY, J.   I concur in all of the foregoing opinion, except the second and fourth divisions thereof.   In that opinion the lien of this defendant is likened to that of a common carrier by vessel or rail, and it seems to be assumed that, because such common carrier has no general lien on any goods in his possession for freight and charges due on prior shipments, therefore[a] this defendant has no lien on logs now in its possession for its charges due on logs heretofore delivered by it; at least, unless they were delivered during the present season.   The charter of defendant makes no such distinction, but allows a lien on the logs remaining in its possession, for the charges on such logs, "and also all charges due on logs or timber of the same mark that may have been previously delivered,"[5] whether delivered in the same season, or some previous season.

In the business of driving and booming logs, any distinction between seasons is wholly arbitrary.   Logs cut one winter, and driven the next spring and summer, will usually continue to be scaled out of the boom for three or four years afterwards.   Of course, the bulk of them usually comes down in the first drive; but many of them, and usually much more than sufficient to pay the boomage charges on the whole, will continue to come down for several years afterwards.   Again, it often happens that only a small part of a mark of logs brought down one season are scaled out to the mills until the next season, and it is very common for a large portion of the logs brought into the booms during one season to be so scaled out during the next.   This being the well-known course of business, it should be held that the legislature intended to give the boom company a lien on the logs delivered this season for the charges due on the logs of the same mark delivered last season and the season before, and every season since that mark commenced to run through the boom, as the same one, continuous, transaction.   Then we see that the lien of this boom company is a floating lien for the whole balance due for its charges against each mark of logs.   This lien is constantly being divested from the logs delivered at one end of the boom limits, and is constantly attaching to the logs coming in at the other end of the boom limits.   Surely such a lien can have but little analogy to the case of the lien of a common carrier on a

[5] Sp. Laws 1867, c. 134, § 12.

single shipment of goods, which are all received at one time, and all delivered at one time.

I make no question but that if the carrier, in such a case, extends the time of payment of his charges beyond the time when the goods are to be delivered, he has thereby waived his lien, and that, if the lien is once waived, it will not subsequently reattach on the default of the shipper, even though the goods still remain in the carrier's possession. But it is also well settled that (no question of principal and surety being involved) a mere extension of the time of payment does not waive the lien of the carrier, if he retains possession, and the extension is not beyond the time when the goods are to be delivered. If this boom company extends the time of payment of its charges as to logs already delivered, it should not be held that it thereby waives its lien for those charges, as against logs of the same mark, which, in the ordinary course of business, will not be delivered until after the time of extension expires. But how are you going to determine what logs will then be left? By simply letting business take its course. By giving the extension the boom company simply agrees to let its lien float back onto the residuum of logs remaining when the extension expires, and in the meantime not to block the course of business. This, in my opinion, is the only reasonable effect to be given to the contract of extension.

The case, in my opinion, is quite analogous to Hughes v. Tanner, 96 Mich. 113, 55 N. W. 661. I do not understand that case as the majority do. The defendants were engaged in running a sawmill, and entered into a contract with a lumber company to saw for it a large quantity of logs at $2.50 per 1,000, which sawing necessarily took the whole season. During the season defendants took 30 and 60 days' drafts for portions of the saw bill. These were not paid when due, and they claimed a lien on all the balance of the lumber not delivered by them, for the amount of these drafts. The court say,[6] "Upon defendant's theory, all of the lumber was to remain on his docks, in his possession, until the saw bill was paid." Again: "In the absence of a right, expressly reserved, to ship before payment of the saw bill, the fact that lumber was shipped away without protest would not take away the right to assert a lien upon

[6] At page 116.

what remained. The right to assert a lien upon what remained was not affected by the release of what was shipped. The contract was entire and continuing. It covered the whole season's cut. What lumber remained was subject to lien for the whole saw bill." In other words, instead of requiring the sawyer to expressly reserve a lien on lumber that would be ready for delivery during the time of extension, the court holds that the lumber company was required expressly to reserve a right to ship during this time, and that "the right to assert a lien upon what remained was not affected by the release of what was shipped."

Under the holding of the majority, I do not see how it is possible for the boom company to give any extension whatever of the time of payment without thereby totally waiving its lien, if in the meantime a single log of the particular mark might have come down and been ready for delivery.

The fact that defendant accepted one note for all the charges on all the logs is not, in my opinion, controlling, or of much weight, as undoubtedly a proper record has been kept of the charges against each mark; and this court should not assume, as to future cases, that the defendant has so intermingled and confused the different items of its account that they cannot be readily separated.

I concur in the reversal of the judgment for the reason that, as stated in the third division of the majority opinion, the stipulated facts do not show that any charges remain unpaid for any of the logs heretofore delivered, of the marks here in question.