DODGE *v.* LANSING & SUBURBAN TRACTION CO.

1. CORPORATIONS — SECRETARY — APPOINTMENT — RIGHT TO COMPENSATION.

Where the by-law of a corporation directs that the board of directors shall "appoint" a secretary, who shall hold his office at the pleasure of the board and receive such salary as the board may determine, the fact that the resolution naming the secretary purports to "elect" him "for the ensuing year" does not affect his right to compensation under the by-law.

2. SAME—NEGLECT OF DIRECTORS.

The neglect of directors to fix the compensation of the secretary as directed by a by-law does not affect his right to recover reasonable compensation for his services.

3. SAME—RIGHT TO COMPENSATION.

Where, at the time of performing certain services for a corporation in addition to his duties as secretary, plaintiff intended to exact pay therefor, and under all the circumstances, the corporation or its agents as reasonable men should have understood that plaintiff was not rendering such services gratuitously but with the expectation of being paid for the same, he was entitled, in the absence of any defense, to recover compensation.

4. SAME — EXPECTATION AS TO COMPENSATION — EVIDENCE — SUFFICIENCY.

In an action against a corporation by the secretary of its predecessor to recover for services performed, evidence examined, and *held*, to show that such services were not performed with the expectation of receiving pay from the company but with the expectation of receiving pay from another source.

5. SAME—ESTOPPEL.

Where plaintiff was present and participated in a meeting of stockholders at which the vote was taken to transfer the assets of the corporation of which he was secretary to defendant corporation, defendant to assume the indebtedness of the transferring corporation, and the question of the amount of indebtedness was under discussion, and plaintiff made no claim that the company was indebted to him for his services as secretary, he was estopped to make such a claim after the transfer was consummated.

Error to Ingham; Wiest, J. Submitted February 18, 1908. (Docket No. 23.)   Decided March 31, 1908.

Assumpsit by Frank L. Dodge against the Lansing & Suburban Traction Company for services rendered. There was judgment for plaintiff, and defendant brings error. Reversed.

*Moore, Brown, Miller & Ladd* ( *Walbridge & Kelley*, of counsel), for appellant.

*Black, Reasoner & Hayden* (*R. H. Person* and *Thomas, Cummins & Nichols*, of counsel), for appellee.

MONTGOMERY, J. In the year 1897 a corporation known as the Lansing, St. Johns & St. Louis Railway Co. was organized for the purpose of constructing an electric railway from Lansing to St. Louis. The plaintiff was one of the incorporators, and other residents of Lansing and along the line of the proposed road were also concerned. The company's general office was in the city of Lansing, and the plaintiff was secretary. But a small amount of the capital stock was paid in, and the testimony tends to show that while the plaintiff and the other officers of the company devoted some time to the enterprise, little progress was made beyond securing rights of way. Negotiations were had with Mills, Percival and Norris for the construction of the road from Lansing to St. Louis, but before an agreement was consummated, it was arranged that the corporation should be reorganized. It was agreed, in the reorganization, to issue double the amount of capital stock which had been subscribed by each stockholder and to issue the same fully paid, in consideration of the services performed by the parties. Under this arrangement, the plaintiff received $7,200 par value of stock. The plaintiff was a member of the board of directors chosen by the new company, and was also elected secretary. As the testimony tends to show, he not only performed the duties of secretary, but from time

to time, and during the entire period prior to the sale by the second Lansing, St. Johns & St. Louis Railway Co. to the Lansing & Suburban Traction Co., hereinafter referred to, rendered services which were claimed, and which the jury found, fell outside the scope of his duties as a director or secretary for the corporation, of considerable value.

This action is brought by the plaintiff to recover compensation for his services as secretary, and also for extraordinary services falling outside the scope of his duties as secretary and as director of the corporation, for the period from the time of the organization of the first Lansing, St. Johns & St. Louis Railway Co. to the time of the sale by the second Lansing, St. Johns & St. Louis Railway Co. to the defendant company.

On the trial of the case, the circuit judge withdrew from the consideration of the jury the plaintiff's claim for compensation for services to the first company, upon the ground that in the reorganization and the issue of fully paid stock to him, such services had been compensated. The questions in this case, therefore, on this hearing, relate to the plaintiff's claim for services rendered to the second company.

His right to recover compensation for services as secretary rests upon section 1 of article 2 of the by-laws of the company, which reads:

" The board or directors shall manage and direct the business and property of this company and shall choose by ballot from their members a president and vice-president and shall also appoint a secretary, a treasurer, a general manager and such other officers and agents as they may deem advisable and who shall receive such salaries as the board of directors may determine. Such appointed officers shall hold their positions at the pleasure of the board of directors."

The contention is made by the defendant that inasmuch as the plaintiff was elected to the office of secretary for the ensuing year, he was not appointed under the terms

of this by-law, the contention appearing to be that, as he was not appointed to hold the position at the pleasure of the board of directors, he did not come within the by-law. It may be that it was within the power of the board of directors to vacate the office at any time. In other words, the by-law may have been paramount. But this in no way affects the fact that he was elected as secretary of the company and acted as such. There is no force in the contention that the mere use of the word "elected" in place of the word "appointed" in the resolution naming the plaintiff for the office affects his rights in any way. It might be suggested that, as the directors did not fix the compensation, they had not acted under the by-law. This precise question was before the court in *Rogers* v. *Railway Co.*, 22 Minn. 25, and it was there held that the failure of the directors to perform their duty in fixing compensation does not deprive the officer performing the service of his right to compensation, and that in the absence of action by the board, he is entitled to recover a reasonable compensation for his services.

It is argued with some force that the services which the plaintiff rendered were rendered as either a secretary or as a member of a committee, and that for this reason he is entitled to recover no additional compensation over and above the value of his services as secretary. It would extend this opinion to too great length were we to attempt to discuss the testimony which bears upon the question of whether the plaintiff rendered extraordinary services in the expectation of being compensated and with the expectation on the part of the officers of the company to pay for the services. The court charged the jury upon this question in brief that if from April 10, 1900, to March 22, 1904, and at the time he performed the same for the company, plaintiff intended to exact pay for these services, and that, under all the circumstances, the company or its agents as reasonable men should have understood that Mr. Dodge was not rendering the same gratuitously, but

with the expectation of being paid for the same, he would be entitled, in the absence of any defense, to recover such compensation. We think no error was committed in this instruction. The language of the instruction is substantially that employed by the Federal Supreme Court in *Fitzgerald & Mallory Construction Co.* v. *Fitzgerald*, 137 U. S. 111, approved in *Felton* v. *Mining Co.*, 16 Mont. 81, and recognized as the correct rule by this court in *Henry* v. *Benevolent Ass'n*, 147 Mich. 142.

Certain documentary evidence appears in the case which bears upon the question of whether, during the period covered by plaintiff's charges which he recovered, the services rendered were rendered in expectation of receiving pay from the company or whether the plaintiff expected his pay from another source. The road was to be constructed by Mills, Percival and Norris, but on the 24th of April, 1900, a letter in the form of a proposal was addressed to Frederick Thoman, Jacob Stahl, and plaintiff, which stated:

"Whereas, under the conditions of a certain proposition made by the undersigned to the Lansing, St. Johns & St. Louis Ry. Co., you as representing that company agreed to raise a bonus of $100,000 which said moneys were to be turned over to the undersigned to be used in the construction of said railway; and whereas it was the understanding and agreement between the undersigned and yourselves that the $50,000 of said moneys was to belong to and be the property of the undersigned and the other $50,000 was to belong to you for the same consideration passing to the undersigned, we do therefore hereby agree that the provision in said proposition made by us and accepted by you relative to the transfer to us of 60 per cent. of the capital stock of the Lansing, St. Johns & St. Louis Railway Co. may, for the purpose of securing to you the return of $50,000 of the said $100,000 bonus be modified as follows:"

Here follows a provision for deposit for security, and then the proposition proceeds:

"That we will, out of the proceeds of the sale of bonds to be issued by said corporation, repay to you the sum of

$50,000 if the said bonus of $100,000 shall have been turned over to us, but in the event of your proceeding on the payment.to us of a sum less than $100,000 we shall only be required to repay to you the difference between the amount so turned over and $50,000."

On the 2d of June, 1900, after the Lansing, St. Johns & St. Louis Railway Co. was fully reorganized, an agreement between the Lansing, St. Johns & St. Louis Railway Co. and Mills, Percival and Norris as contractors was entered into. By the terms of this contract, the contractors agreed to begin construction of the work, furnish the labor, material, etc., and to complete the same before November 15, 1901. The company agreed to secure the right of way and easements, and also to deliver to the contractors the sum of $100,000 in cash as follows:

"Thirty-five thousand dollars when the first ten miles of the track is constructed; thirty-five thousand dollars when the second ten miles of the track is constructed, and the remaining thirty thousand dollars when a total of twenty-five miles of track shall have been constructed."

It also provided that the contractors might demand and receive 60 per cent. of the total capital stock of the company, and that the issue and transfer of the stock upon the books of the company should be made, and the contractors were invested with authority to bond the road for the sum of $25,000 per mile, such bonds to be delivered to the contractors in part consideration for the construction of the road, the contractors to have entire charge of issuing, negotiating, and disposing of the bonds.

Following upon this, and on the 22d of August, the following proposition was addressed to Thoman, Stahl, and Dodge:

"Whereas, under conditions of a certain proposition made by the undersigned to the Lansing, St. Johns & St. Louis Ry. Co., you as representing that company agreed to raise a bonus of $100,000, which said moneys were to be paid to the undersigned to be used in the construction of said railway, and whereas, it was the understanding and agreement between the undersigned and yourselves

that but $55,000 of said money was to belong to and be the property of the undersigned and the balance of $45,-000 was to be returned to you for *certain considerations, passing to the undersigned and other valuable consideration received,* we do therefore hereby agree to secure *to you* at the time *it is paid to us* the return *to you* of all moneys or stock to be used for bonus purposes in excess of $55,000 cash which may have been *paid to us by the Lansing, St. Johns & St. Louis Ry. Co.* in accordance with *our contract with them.* We further agree that the said amount over and above said $50,000 to be returned to you, $50,000 to be returned to you as aforesaid, shall be paid to you out of the proceeds of the sale on bonds on completion of contract, November 1, 1901; which bonds are to be issued by said railroad company, it being understood that whatever cash is advanced to us in excess of $55,000, together with whatever stock is needed to make up the said $100,000, shall be returned or refunded to you as hereinbefore provided for. Furthermore, we agree that you shall be —— of trustees for collection and paying over of the $100,000, said trustees are expected to take whatever action may be necessary by suit or other means, to secure and recover payment of all stock subscriptions or bonus notes."

On the trial of this case the plaintiff testified that he construed this agreement to have been made on behalf of the railroad company, but on the trial of the case between the plaintiff and the Lansing, St. Johns & St. Louis Railway Co., in 1902, the plaintiff testified as follows:

" *Q.* Your statement in response to Mr. Ostrander that there was an understanding that you three gentlemen would have $45,000 or a certain amount of money?

"*A.* Well, that was a proposition emanating from John E. Mills and Edward F. Percival and Frederick C. Norris, in which they agreed to pay us, Stahl, Thoman and Dodge, $15,000 each out of the sale of the bonds when made.

" *Mr. Ostrander:* Is that in writing.

"*A.* Yes, sir.

" *Q.* Have you got it?

"*A.* I have.

" *Mr. Ostrander:* I suggest you produce it and not testify to anything that is in writing.

" *Q.* Have you got the writing here?

"*A.* Yes, sir.

"*Q.* Will you produce it?

"*A.* Yes, sir.

"*Q.* What is the date of that agreement made by Mills, Percival and Norris?

"*A.* August 22, 1900.

"*Q.* Read that.

"*A.* That is not the proposition that was originally made by Mr. Mills.

"*Q.* Well, read that (reading).

"*The Court:* That has been read.

"*Q.* Now can you tell us what the other valuable considerations were that you referred to in this agreement made by these parties, the paper itself does not tell what the consideration was, can you tell?

"*A.* Well, I will read it, $55,000 of said money was to belong to and be the property of the undersigned, and the balance, the $45,000, was to be returned to you for certain conditions passing to the undersigned and other valuable considerations received, that is all part of the question.

"*A.* Originally, Mr. Mills made a proposition in which he placed the 60 per cent. of the stock in the hands of trustees as security from him and his associates for the carrying out of his propositions to Stahl, Thoman and myself, and afterwards he came to us and suggested he had made a mistake, or that the putting up of the stock placed the matter in such shape that it would cripple him in his negotiations, and then he made a proposition, that arrangement I think was for $50,000 in bonds or in money, whichever it may have been originally, and that the amount should be a lesser sum than that one, you see that proposition was for $50,000 bonds.

"*Q.* What was to be done with the bonds?

"*A.* When the sale of the bonds were made or the bonds were to be issued to us,—

"*Q.* What do you mean by that?

"*A.* To Thoman, Stahl and myself that we should have for the work and the amount we had put into the enterprise as well as the money we had spent and the effort and work that we might put into the enterprise if it was carried out according to the contract that he would pay us that sum as our share for the interest in the entire enterprise.

"*Q.* What sum, $50,000 in bonds?

"*A.* $50,000 either in bonds or money, and we would

hold the 60 per cent. of stock for the carrying out of that and then he came to us and insisted that we ought to let him off in that connection and finally we consented to do it, Mr. Stahl and Thoman and myself, and then he wanted the amount that we were to have for our part in the enterprise fixed at $40,000, and he insisted upon it, and finally Mr. Thoman was willing to grant it, and Mr. Stahl refused, but finally Mr. Stahl consented that we would return the stock to him or at least give him the other stock, and issue it to him so that he could have the benefit of it, and he made this arrangement and that is in his handwriting, the proposition to us and gave that to either one or the other of us, it was filed away in my safe or in the hands of Mr. Stahl at first and afterwards it came to me.

"*Q.* Well, about when was this conclusion finally reached about the date of this instrument, August?

"*A.* Well, we released the stock and everything about that time we had the control of the stock absolutely under the arrangement we made under the proposition or was to have it.

"*Q.* Then so far as the $100,000 was concerned or whatever might be collected so far as these subscriptions were concerned that was to be turned over absolutely to them?

"*A.* Every dollar of it was to be turned over to them except that we were not to lose sight of the fact of the representations that had been made to the others when they went along with the road that was to be turned over exactly in accordance with the agreement, and I will say in that connection that I myself was desirous, more so than the other gentlemen, perhaps, of enforcing some collection and turning it over. I wanted to get my part of the forty or forty-five thousand dollars, as soon as possible, and I urged the turning of it over, but Mr. Thoman insisted it should not be turned over,—that we could not do that as we would be held accountable by the subscribers in Lansing, and of course I acquiesced in their judgment about it, and that the realizing of anything under that proposition of Mr. Mills was depending upon the money being collected here and St. Louis and until that was done there wasn't anything that the trustees could do until that was raised, but the—it provided that the road should be built on 1st day of November, 1901, but we settled with —either under the sale of the bonds, or otherwise, but the

hundred thousand dollars or anything below that or about that all of it was to be turned over to Mr. Mills.

" *Q.* And this was simply the amount that you gentlemen were to realize and all that you were to realize out of this business ?

"*A.* Out of the entire work from the beginning to the close that was the only possible payment that these gentlemen were to receive other than the 72 or 3 or 4 hundred dollars of stock that they had in the road as had been referred to here. That is to say that was all that was to be received so far as any agreement there provided for."

Mr. Thoman on that occasion gave similar testimony. It appears without dispute that the agreement of August 22d was received by Mr. Dodge and filed away, and there is no doubt that Mr. Stahl and Mr. Thoman were made acquainted with its contents, and whatever was done thereafter, by either of the three was done with the understanding that that obligation was in force and binding upon the contractors.

It was the contention of the plaintiff on this trial that this contract of August 22d was a contract made on behalf of the railroad company. We cannot so construe the contract. It refers in terms to a previous agreement with the railroad company in which the company had agreed to transfer $100,000 in cash to the contractors, and it refers to the understanding and agreement between Thoman, Stahl, and Dodge and the contractors that but "$55,000 of the money was to belong to and be the property of the contractors, and that the balance was to be returned to you (the parties addressed) for certain considerations, passing to the undersigned, and other valuable considerations received." There can be no mistaking this language. If the contractors were to receive but $55,000 from the company, it was idle to make provision for turning over $100,000 and then turning back $45,000 to the company. There was no consideration "passing to the undersigned" or other valuable consideration received by the contractors from the company. There is no room for mistaking the tenor of this proposition. The circuit judge

entertained this view, and charged the jury that if the proposition was accepted by Mr. Dodge and the other parties to it, it became a contract, and that acting under it would constitute an acceptance and make it a contract. He added:

" If this proposition made by Mills, Percival and Norris to Mr. Dodge and to Stahl and Thoman was accepted, did it provide for compensation to Mr. Dodge for any of the services he asks pay for from the defendant in this case? If it did then to that extent Mr. Dodge had an express contract for his services and the pay therefor, and he cannot upon failure to realize under that arrangement hold defendant upon the theory that he looked to the Lansing, St. Johns & St. Louis Railway Company for pay as upon an implied contract."

We discover no suggestion in the record of any purpose of this contract or agreement to turn over $45,000 to these three gentlemen other than the one which the plaintiff stated in his testimony on the trial of the former case, namely, that it was to compensate Thoman, Stahl, and himself for the work and the amount they had put into the enterprise, as well as the money spent and the effort and work that they might put into the enterprise if it was carried out according to the contract, and that it was to be paid as their share for interest in the entire enterprise.

Defendant preferred a request on the trial as follows:

" If you find from the evidence in this case that the ount of the indebtedness of the Lansing, St. Johns & St. Louis Railway Company was discussed and talked over by the stockholders of said company, in the presence of Mr. Dodge, at its meeting held March 9, 1904, when it passed a resolution to sell and transfer its property to the Lansing & Suburban Traction Company, and that the amount and items of said indebtedness was stated as that represented by the bonds amounting to the sum of five hundred thousand dollars and the indebtedness of the company under its contract of construction with Mills, Percival and Norris, and Mr. Dodge made no claim for services at that time, but remained silent, without stating to the said stockholders that he had a claim for services rendered by him in behalf of the company, as attorney and agent

and for extraordinary services and for services as secretary of the company, he cannot now recover in this case for the reason that the silence misled the stockholders and incorporators of the Lansing & Suburban Traction Company, who were about to take said property subject to the indebtedness of the Lansing, St. Johns & St. Louis Ry. Co., and he would now be estopped from asserting such a claim."

Myron W. Mills, who was one of the incorporators of the defendant company, was also a stockholder in the second Lansing, St. Johns & St. Louis Railway Co., testified that he was present at the meeting of the stockholders of the Lansing, St. Johns & St. Louis Railway Co. when the vote was taken to transfer the assets to a corporation to be organized, and that a few days later, on March 22, 1904, he was present when the board of directors passed resolutions in accordance with the resolution of the stockholders providing for a transfer of the property to the defendant company. He testified that plaintiff was there, that he at the time made no claim of any indebtedness due him, that he had not understood that the plaintiff was performing services as an attorney, agent, or in any other capacity with the expectation of pay, except such as he might get as one of the promoters of the enterprise. He also testified that at the meeting of the stockholders the debts were discussed, and that it was said that the only debts of the company were its bonds and the contract with the contractors, Mills, Percival, and Norris, for the construction, and that Mr. Dodge, being present at the time, did not dispute the statement, and made no statement that he had any claim against the company. Similar testimony was given by Mr. Elliott, another stockholder in the defendant company, who testified that he had no knowledge that plaintiff had any claim against the company.

We think, in view of this testimony, the instruction asked was clearly proper. It is true that plaintiff voted against the transfer of the stock, but he was in a position where he knew there was under discussion the question of

the extent of the liabilities of the corporation, which liabilities, under the agreement between the two companies, the defendant company agreed to assume. It is obvious that if he kept silence when it was asserted in effect that he had no claim against the company, the defendant was being misled as to the extent of the obligation which it ostensibly took upon itself. A clearer case of one remaining silent when he should have spoken it is difficult to conceive. The obligation to speak in such a case arises out of natural justice, and if the case is made as stated by the testimony of the witness quoted, the plaintiff ought not to be permitted to recover of the defendant upon the theory that it assumed an obligation to pay his claim, a claim which was in his presence expressly disclaimed, and without dissent from him. See *Hughes* v. *Tanner*, 96 Mich. 118; *Miller* v. *Ross, Bradley & Co.*, 107 Mich. 540.

It is suggested that the defendant was not a bona fide purchaser, and that it parted with nothing valuable nor acted to its prejudice. It is clear that they did take upon themselves the responsibility of assuming indebtedness of a half million of dollars secured by the bonds and also the unsecured indebtedness of the company. The contention that the defendant company was not a bona fide purchaser is not amplified, but if what is meant is that its officers were not deceived by the plaintiff's silence when he should have spoken, the testimony above quoted is a sufficient answer to the contention.

For the errors pointed out, the judgment will be reversed, and a new trial ordered.

GRANT, C. J., and BLAIR, HOOKER, and MOORE, JJ., concurred.