GERMAIN *v.* CENTRAL LUMBER CO.

116  245
s 120   62

1. LOGGING CONTRACTS—CONSTRUCTION—PAROL EVIDENCE.

A contract between a logger and a sawyer was evidenced by two papers delivered at the same time, the one, a letter offering to sell the logs for a stated price per M., payments to be made in advance in negotiable paper of specified amounts, upon which letter the sawyer's acceptance was indorsed; the other, a letter bearing date one day later, offering to buy back the lumber manufactured from the logs at the same price per M. that was paid for them, and to pay a stated amount per M. for the sawing, which likewise contained the sawyer's written acceptance.    The logger agreed to take care of the sawyer's paper whether or not the logs were delivered as agreed    *Held*, that it was competent for the sawyer to show by parol that the transaction was not a purchase and resale, but that it merely provided a security for advances.

2. SAME—SAWYER'S LIEN—RELEASE.

The fact that the logger was to take up the sawyer's notes on or before a certain date "from proceeds of sales of lumber," that the time for the payment of the saw bill was extended beyond such date, and that shipments of lumber were in fact made from time to time, would not deprive the sawyer of his lien for the saw bill upon lumber remaining in his possession.

3. SAME—ACCEPTANCE OF NOTE—PAYMENT—INTENT.

Taking a note for a saw bill does not release a lien on the lumber for sawing, unless it is shown to have been accepted in payment of the bill.

4. EVIDENCE—CUSTOM.

A sawyer's lien for his saw bill cannot be affected, while he retains the actual possession of the lumber, by any custom which relates merely to the method of removing lumber from the sawyer's docks when no lien rights are involved.

5. SAME—INSTRUCTIONS.

The admission of evidence as to such custom in a case involving a sawyer's lien is prejudicial error, where the jury are instructed that they may consider "all the evidence in the case" in determining whether or not the lien had been waived.

6. SAME.

The exclusion of competent testimony, offered to show the real character of an ambiguous instrument, is prejudicial, although the court afterwards construes the instrument in accordance with the contention of the party offering such testimony, where the testimony might have aided the jury to a better understanding of the matters involved.

7. SAME—WAIVER OF LIEN—INTENT.

Upon an issue whether a sawyer waived his lien on lumber for a saw bill by receiving notes in payment or by surrendering possession of the lumber, his testimony that he did not intend to waive his lien is inadmissible.

8. SAME—BURDEN OF PROOF.

The burden is on the purchaser of lumber in possession of a sawyer to show that his lien for sawing had been terminated.

Error to Saginaw; Snow, J. Submitted January 27, 1898. Decided March 15, 1898.

Replevin by Edward Germain against the Central Lumber Company. From a judgment for plaintiff, defendant brings error. Reversed.

*Hanchett & Hanchett*, for appellant.

*Weadock & Purcell*, for appellee.

LONG, J. This is an action of replevin for a quantity of lumber which defendant claimed to hold to secure the payment of certain bills for sawing it. Plaintiff contended that defendant had delivered the lumber to him, and had thereby released its lien for the saw bill, which claim was denied by the defendant. It was the contention of the defendant that, while the lumber remained on the dock, it was in its possession, and that the lien for the saw bill remained upon the lumber which was replevied. On the trial, the defendant waived return of the lumber replevied. The questions submitted to the jury were whether the defendant had a lien on this lumber at the time of the commencement of the suit, and whether the testimony tended to show that this lien had been waived and released by the defendant. The jury found in favor of plaintiff, and defendant brings error.

It appears that defendant operated a saw mill on Saginaw river. In April, 1895, and for some time before that, J. W. Howry & Sons were engaged in lumbering in Saginaw and Canada, and they owned in Canada several million feet of pine saw logs. On April 5, 1895, Howry & Sons wrote defendant as follows :

"We will sell to you seven million feet of our Georgian bay logs, marked crescent or scroll, delivered to your mill, for $12 per M. feet, and commence delivering the same during the month of June, 1895, unavoidable delays excepted ; you to give us $40,000 of your paper on account this date, and $25,000 more in amounts $5,000 each a few days previous to the maturity of the $25,000 paper given us by A. T. Bliss, same being in exchange for our paper ; measurement of logs and lumber to be hereafter mutually agreed upon ; you to keep the lumber fully insured, and loss, if any, payable to us as our interest may appear."

The defendant, on the same day; indorsed the letter as follows :

"We hereby accept the above proposition of J. W. Howry & Sons."

The following receipt was thereupon signed by J. W. Howry & Sons:

"Received of the Central Lumber Company, April 6, 1895, their paper as follows, all dated April 5, 1895: Due four months, $5,000; August 20, 1895, $5,000; five months, $5,000; six months, $5,000; seven months, $10,000; November 20, 1895, $10,000,—total, $40,000."

On the same date as giving this receipt, J. W. Howry & Sons also wrote the defendant as follows:

"We hereby agree to buy back from you the lumber manufactured from logs sold you April 5, 1895, at the same price you paid us for logs, viz., $12 per M., and agree to pay you $1.75 per M. for sawing same; terms of saw bill to be six months from completion of each million feet, but notes to be made for each two million feet cut, and time averaged. We will take up your paper given us on account of purchase of logs on or before July 1, 1896, from proceeds of sales of lumber, and agree to keep the lumber insured; you to manufacture the logs in good and workmanlike manner, and subject to our instructions. You will also give renewals of your notes from time to time, but such renewals not to extend beyond July 1, 1896. The paper you give us shall be taken care of by us, whether the seven million feet of logs are delivered to your mill or not. You are to cut up to eight million feet of our logs if we have them."

The terms of this writing were also accepted by the defendant in writing. There was also written on the margin of this writing the following:

"You to saw four million feet of our logs when they arrive. Then we agree to allow you to saw 30 days on your own, and after that time you will turn back on our logs, and finish them."

After these contracts were made, the logs described therein were delivered to defendant's mill, and by it sawed into lumber during the season of 1895. The saw bills amounted to something over $14,000, and notes were given from time to time for them. These notes were paid or renewed; so that at the time of plaintiff's purchase from Howry & Sons, as hereinafter stated, there remained several of them outstanding.

On April 23, 1896, Howry & Sons made a written

proposition to plaintiff to sell him this lumber, situated at defendant's mill, estimated at 1,641,000 feet, also to sell him certain lumber situated at Hargrave & Sons' docks, for $11 per M. for common, and $7 per M. for mill culls. This proposition was accepted. It appears that this lumber, as it was cut by defendant, was piled on its docks at its mill in the usual manner of piling lumber when sawed for other parties, and the piles were marked "J. W. Howry & Sons." Lumber was sawed for other parties, and piled upon the same docks, and designated by marks. The Howry lumber was not all piled in one body on the same part of the dock, but other lumber was piled between portions of the Howry lumber; and the testimony shows that the Howry lumber was so marked by the bookkeeper of defendant, to distinguish it from other lumber.

A short time after the plaintiff purchased from Howry & Sons, while the lumber thus remained on the dock, he went to the defendant's dock, and saw A. J. Linton, who was defendant's manager, and had active control of the business done at the mill in sawing the lumber, and of the details of the business. Plaintiff testified that he notified Linton that he had bought the balance of the Howry lumber unsold upon defendant's docks; that Linton expressed satisfaction, as the removal of the lumber would give the company more dock room. Witnesses Corcoran, Alverson, Little, and Holihan all testified, in substance, that Linton pointed out the lumber plaintiff had bought, assisted or was present at marking up to him piles of the Howry lumber that there was any uncertainty about, saw the lumber shipped away to him, and received inspection bills of shipment as made. Linton denied that he had any knowledge of the plaintiff's purchase until he commenced to ship, and denied the testimony of Corcoran, Alverson, Little, and Holihan.

It appeared that, before the sale to plaintiff, Howry & Sons had sold to Randall & Boyd, February 14, 1896, about 2,000,000 feet of its lumber sawed under the contract.

of April 5 and 6, 1895; to Thompson, Lamb & Co., in December, 1895, between 1,000,000 and 2,000,000 feet; and had made a sale to L. C. Slade, before the sale to Randall & Boyd, in February, 1896, and to Jackson & Co., in 1895. Linton, on cross-examination, after testifying as to above sales, said:

"This Howry lumber was sold to Thompson, Lamb & Co., Lewis C. Slade, Randall & Boyd, Thomas Jackson & Co., and Germain; and Germain got what was left of the merchantable lumber, after all the other sales had been made.

"*Q.* Yes; and the other sales made by the Howrys had been chiefly shipped before Germain commenced shipping?

"*A.* Yes, sir.

"*Q.* There was little, if any, of this Howry lumber on the docks, except some that belonged to Randall & Boyd, when Germain commenced shipping the lumber?

"*A.* There was some of the Thompson, Lamb & Co. lumber on the dock.

"*Q.* A small portion of that, and a small portion of the Randall & Boyd?

"*A.* Yes, sir.

"*Q.* Now, all of this lumber which was shipped up to the 15th of July included all these parties' and included Mr. Germain's? You hadn't protested to the shipment made on the 15th?

"*A.* No.

"*Q.* So that the first protest you ever made was on the 15th of July, when Germain sent down to take the balance of this lumber?

"*A.* Yes, sir.

"*Q.* And after you had heard of the suspension of J. W. Howry & Sons?

"*A.* Yes; I had heard of it.    *    *    *

"*Q.* You knew there had been inspection bills of the lumber shipped to Germain furnished you?

"*A.* Yes.

"*Q.* You knew it meant it had been sold to Germain?

"*A.* No, I did not,—only from hearsay.

"*Q.* You have been in the lumber business how many years?

"*A.* Thirty.

"*Q.* And did you—your company—receive that inspection bill?

"*A.* Yes, sir.

"*Q.* And that informed you that lumber had been shipped—this Howry lumber—to Germain?

"*A.* I knew that Germain was getting that lumber.

"*Q.* You knew it from the time, at least, that you got this inspection bill?

"*A.* Yes, sir; I knew he was getting the lumber.

"*Q.* And that continued up to July 15th, when you refused to let him have any lumber?

"*A.* Yes, sir.

"*Q.* You said this morning you had heard some rumor before any shipments of this lumber that he had purchased it?

"*A.* It was common talk. I don't know how I heard it.

"*Q.* That Germain had bought the balance of the Howry lumber?

"*A.* That he had bought some of the Howry lumber; not the balance, but some of it.

"*Q.* That came to your knowledge before any of this lumber was shipped?

"*A.* I think so.

"*Q.* So that, with that information, from whatever source you got it, you permitted Mr. Germain's men to remove the lumber up to the 16th of July, when you heard that Howry & Sons had suspended payment?

"*A.* Yes, sir.

"*Q.* You never claimed, up to that time, to any one, that you had any lien for saw bill or anything else, did you? I mean to Germain or any of his men.

"*A.* No, sir."

Upon the close of the testimony, plaintiff's counsel asked the court to direct a verdict for the plaintiff upon the grounds:

1. That by the contract of April 6, 1895, between the defendant and J. W. Howry & Sons, it was not contemplated that the defendant should retain a lien for the saw bill, because by its terms it was contemplated that the lumber should be sold by Howry & Sons, and the proceeds applied upon the payment of certain notes described therein.

2. That, by the terms of the contract, it was contemplated that the saw bill should be paid by Howry & Sons giving their promissory notes for it, which they did, thus paying and discharging any lien on the lumber for saw bill.

3. That the notes given for the saw bill and the renewal thereof extended the period of the payment of the saw bill beyond the time when it was contemplated that the lumber should be sold and delivered by Howry & Sons.

4. That the terms of this contract are inconsistent with defendant's having any lien upon the lumber sawed by it for saw bill.

This request the court denied, and permitted the case to go to the jury. Plaintiff now contends that the court should have directed verdict in his favor. His theory is that the letter of April 5, 1895, and the acceptance, together with the letter of April 6th and the written assent to its terms, constitute a complete contract, clear and free from ambiguity, and that it is not competent to vary its terms by parol evidence; that, by the terms of the letter and acceptance of April 6th, it was clearly provided that the defendant was selling the lumber to be manufactured from the logs purchased from Howry & Sons under the contract of April 5th, and that the price was to be $12 and $1.75 for saw bill, or $13.75 per M.; that if this, then, was the lumber of the defendant, it could have no lien upon it for its own bill, but that, if the whole transaction was what the trial court held it to be,— an arrangement to secure the defendant for certain advances made to Howry & Sons,—this fact would not aid the defendant, for, by the terms of the agreement, Howry & Sons were to take up the paper given on account of the purchase on or before July 1, 1896, from proceeds of sales of lumber, and keep the lumber insured; that the term of the saw bill was to be six months, and defendant's notes to be renewed until July 1, 1896; that it is therefore clear that it was within the contemplation of the parties, by their own contract, that Howry & Sons were to sell this lumber, and from the proceeds pay the purchase-price notes; that the lumber could be sold at any time, especially after it was marked with Howry & Sons' name, on defendant's docks; that all these arrangements make it clear that the court should have directed the verdict in favor of plaintiff. It is therefore contended that—

1. When the terms of the contract from which the alleged lien springs are inconsistent with the intention of retaining a lien, no lien attaches.

2. When the party claiming a lien has accepted promissory notes for the amount claimed, payable at a time in the future beyond the time at which the owner can remove the property, the lien is lost, and, when once lost, is lost forever.

The attention of the court below was called to these claims by requests to charge, and the court stated:

"I think it was simply security for advancements. At the first reading, it would appear that it was a sale of the logs, and agreement afterwards made to purchase back the lumber to be manufactured from the logs; but taking that with the other ingredients, and considering it as one obligation,—one contract,—delivered at the same time, it is different, and I will take a different view of it. As I remember the proofs in regard to those two papers, there was no dispute but that these two papers were delivered at the same time."

The defendant called its manager, Mr. Linton, with whom Howry & Sons made the contract, and he testified substantially that there was no agreement between the defendant and Howry & Sons that their notes given on the saw bill should be received in payment of the bill.

Counsel for plaintiff cite, in support of their above contention, *Au Sable River Boom Co.* v. *Sanborn*, 36 Mich. 358. In that case, however, it was found by the court that, from the terms of the contract, the owners of the logs had a right to remove them at any time, subject to the payment only of any sum then due, and that no understanding could be implied that the logs on hand should be retained as security for the payment at a future time of a sum not presently payable; that the owners of the logs therefore must have had a right to remove them after the acceptances were given, and consequently no lien attached. There the acceptances were taken at the request of the owners of the logs, and for their accommodation, and discounted by the plaintiff. The court found specially in that case that the usual custom of the plaintiff was to require payment for

the running, etc., of logs, on delivery of the same to the owner; and in taking these acceptances, payable at a future time, the transaction was found not to be one in which the acceptances were taken as payment, the court saying: "The taking of acceptances, according to the well-settled doctrine in this State, was not payment of the demand, in the absence of evidence of an agreement that they should be received in payment;" citing *Gardner* v. *Gorham*, 1 Doug. (Mich.) 507, and *Hotchin* v. *Secor*, 8 Mich. 494. The court further said: "There is no evidence of such an agreement here. It does appear, however, that the acceptances taken were payable at a future day, and we understand from the finding that they covered the whole amount then due." It will appear at once in that case that the owners had the right to take the logs from the boom at any time, and that no understanding could be implied that it was the intention that the plaintiff should hold them as security for the payment at a future time of a sum not presently payable.

In the present case, the court below was correct in the interpretation given by him of the arrangement between the parties. The logs were turned over to the defendant as security for advances. It is true that, by the terms of the contract, Howry & Sons were to take up these notes before July 1, 1896, from proceeds of sales of lumber. They did take up certain of them from time to time as sales were made. The saw-bill notes amounted to just $14,000. The sawing amounted to something over that. But it cannot be said that Howry & Sons had the right to demand and receive the lumber at any time without payment of the saw bill, unless the notes were received by defendant as payment. Whether they were so received was a question of fact for the jury, under all the circumstances of the case. The mere taking of the notes was not evidence of this, and there is no agreement shown that the notes were to be so treated. *Craddock* v. *Dwight*, 85 Mich. 587. In *Hughes* v. *Tanner*, 96 Mich. 113, it was held that, in the absence of a reservation in a sawing con-

tract of the right to ship the lumber before payment of
the saw bill, the shipment of a portion of the lumber with-
out protest will not prevent the contractor from claiming
a lien upon the remainder for the whole saw bill. The
court was not in error in refusing to instruct the verdict
for the plaintiff.

The defendant contends that the court erred in admit-
ting the following testimony of the witness Corcoran:

"*Q.* Do you know the custom as to the delivery of lum-
ber on saw-mill docks along the Saginaw river in July,
1896, during that season ?

"*A.* I do; yes.

"*Q.* State what it was.

"*A.* Well, any customer we do business for would
direct its shipment. We would go to the dock with our
lighter or vessel or cars, and load it on. Then, when we
got through, we would send an inspection bill to the pur-
chaser, one to the seller, and, if sawed at a custom mill,
one to the custom mill, showing the total amount of lum-
ber shipped.   *   *   *

"*Q.* Tell us what the custom was in reference to the
delivery of lumber from the saw-mill dock, after the pur-
chase, to the purchaser.

"*A.* When directed by the purchaser to remove the
lumber, either the shipper or some one in his employ is
sent to the dock with his vessel or lighter or car; and if
the lumber was plainly marked up, and we knew exactly
the number of piles that went, and there was no ques-
tion about it, we would direct him to go to such a place,
and take such lumber. If there were any link in the
chain lacking that we might be in doubt about as to
where to place the lumber and place it right, we would
ask them—ask the mill men, or some one in charge
there—to show us the lumber, to put them right. I don't
remember that we have ever dealt with the Central Lum-
ber Company in the delivery of lumber in that manner
outside of the Germain case. Lumber is not loaded any
differently from their dock than from any other dock on
the river.   *   *   *   In this case I sent an inspection bill
to the Howrys, and one to Mr. Germain, showing the in-
spection of the lumber; the better lumber in one lot, and
the mill culls in another. We sent to the Central Lumber
Company an inspection bill showing the total amount.
*   *   *   The purpose of sending an inspection bill to the

saw mill, the seller, and the purchaser, is to give the saw mill the record of the amount sawed, and to the seller and purchaser the amount of property shipped."

Defendant's counsel contend that the lumber remained under defendant's charge, and in its actual possession, until it was removed from the dock onto lighters for shipment, and that there is no evidence of any acts showing a parting with the actual possession of the lumber by defendant, except as the lumber, which was from time to time loaded on the scows for shipment, was loaded and taken away; but that as to the lumber not so loaded, and which was replevied, it remained in the possession of the defendant precisely in the same condition as when first piled on the docks. It is also contended that there is no evidence in the case tending to show any agreement between the defendant and the plaintiff that any other act than the shipment of the lumber should be or constitute a change of possession of it. Therefore it is claimed that the custom which the court permitted plaintiff to inquire into by the testimony above set forth was wholly immaterial and incompetent to show any delivery by defendant to plaintiff of the lumber which was replevied, or any parting with the possession by defendant, whereby it abandoned or released its lien; and that such testimony was misleading to the jury, as, under the charge, they were directed to consider it. The court charged the jury that—

"The question of delivery is one of fact, and it is mostly governed by the intention of the parties; and if, from all the evidence in the case, you find, from the conduct of the parties, as described by the witnesses, that it was the intention of the defendant company to deliver the lumber to Mr. Germain, then this conduct would amount to a delivery, and the defendant thereby waived all lien upon the lumber, and the plaintiff is entitled to recover."

The court also charged:

"In considering the question of whether or not the defendant has a lien upon the lumber in question, you are at liberty to take into consideration all the evidence tend-

ing to show that no claim of lien was made upon said lumber by said defendant company up to the time when it was made known that Howry & Sons had suspended payment."

It is contended that by these instructions the jury understood that they were to take into account the custom which was testified to by witness Corcoran, which custom was in fact nothing but a method of removing lumber from the dock by inspectors when they were sent for it; that the lien of the saw bill is preserved by retaining the actual possession of the lumber, and a parting with such possession is a termination of the lien; that custom has nothing to do with the facts which constitute an actual possession, and such custom as the witness was inquired of and testified to had no bearing upon that point.

It appears that there was no evidence of any act showing a parting with the actual possession of the lumber by the defendant, except that some lumber was from time to time loaded for shipment and taken away. The custom testified to was nothing in fact but a method of removing lumber from the docks by inspectors when they were sent for lumber. The lien of the saw bill is preserved by retaining the actual possession of the lumber sawed, and the custom of shippers could not destroy the right of the sawyer to such possession; nor is it any evidence of an intent to deliver all the lumber, and thus waive or terminate the lien. It had no bearing upon the facts which constitute the lien. It has been repeatedly held that custom cannot change a definite contract. *Lamb* v. *Henderson*, 63 Mich. 302, and cases there cited. Under the charge of the court, the jury were directed to take into consideration all the evidence in the case in determining the intention of the defendant to deliver the lumber, and if, from such evidence and the conduct of the parties, they found it was the intention of defendant to deliver it to plaintiff, the lien was waived, and plaintiff entitled to recover, etc. The jury may well have understood that this

included the custom testified to by Mr. Corcoran. We think the testimony may have misled the jury.

Testimony was offered by the defendant to show the actual purpose and character of the contract between defendant and Howry & Sons; that is, to show that the actual title to the logs remained in Howry & Sons, and that defendant only had a lien. This the court refused to receive. We think the contract not so plain in its terms that it was not susceptible of explanation by parol evidence; not for the purpose of contradicting or varying its terms, but to show what the understanding was as to the lien which defendant claimed, and that it was but a mere security for advancements made by defendant. The court, it is true, did charge the jury that it stood as security for these advancements. But the testimony offered by defendant was competent to show that the logs were held as such security (*Seligman* v. *Ten Eyck's Estate*, 74 Mich. 525); and such testimony might have aided the jury in a better understanding of the matters involved.

Claim is also made that the court erred in refusing to permit the witness Linton to answer several questions put to him by defendant's counsel. He was asked: "*Q.* Have you at any time done or said anything by which you waived or intended to waive or release the saw-bill lien upon the lumber replevied ? *A.* No, sir." After this answer was given, it was objected to as incompetent, etc. The court said: "The question as to whether he had done anything to release any lien would be calling for a conclusion, but the facts—what was said and done— would be competent." Witness was then asked: "Have you at any time intended to waive or release the lien of the saw bill on this lumber ?" "State whether, so far as you know or intended, the lien has been kept on the lumber which was replevied." "Have you ever given your assent to the release or waiver of the lumber to either Mr. Germain or the Howrys ?" These questions were objected to as incompetent, and objections sustained. It appears that, in the earlier part of Mr. Linton's examination, he was

asked: "What consent did you at any time give to the removal from the dock of the lumber that was replevied? *A.* None whatever." It is contended by counsel for plaintiff that this last question stated and answered was substantially an answer to the other questions, and for that reason no error was committed, even if the questions were proper. The contention of plaintiff's counsel further is that this testimony was not admissible under the facts in the case—*First*, because it was in contradiction of, and varied the terms of, the contract of April 5 and 6, 1895; *second*, because the question was one to be determined by the jury, and the witness could not upon this fact declare his opinion or conclusion that he had a different intent than what his actions and conduct indicated, or that he had a different intent from that which would be the natural, reasonable, and only inference from his acts and declarations.

The first point made against the introduction of this evidence has no force. The contract was open to parol evidence to determine whether it was made for the purpose of securing the advances. But, upon the other ground, we think the court was not in error in refusing to permit the witness to testify to his intention in reference to the waiver of the lien. The defendant had a lien for saw bill, and unless something had been done by Mr. Linton, as manager of the defendant company, to waive it, the defendant had the right to its enforcement. If the notes for the saw bill were given and received as payment, it was a waiver of the lien. If Mr. Linton surrendered possession of all the lumber to the plaintiff, and agreed that he might remove it, Mr. Linton at that time knowing that plaintiff claimed to have purchased it from the Howrys, that would be a waiver of the lien. These were questions for the determination of the jury. The intention of Mr. Linton was not the controlling feature of the case, as suggested by the court in its charge. There were two questions for the jury: *First*, whether the notes for the saw bill were received as payment for the sawing; *second*, whether

there was suc  a surrender of the lumber by Linton, and taking possession of it by the plaintiff, as amounted to a delivery of the whole lumber purchased by plaintiff. There are cases in which the intent is an important element in the transaction, some of which are cited by counsel for defendant.   We think the present case comes within the rule of *McKinnon* v. *Gates*, 102 Mich. 621, in which it was held that neither party was entitled to testify to his understanding.

We think that the court was also in error in charging the jury that they might go back of the time of the sawing of the logs to find something to show an abandonment of the lien.

The defendant substantially asked the court to charge the jury to find the verdict in its favor by its requests numbered 4, 6, 7, 9, and 10, and now insists that the same should have been given.   We think not.   The question was one for the determination of the jury under all the circumstances.   Notes had been taken for the saw bills, and there are some other circumstances which the jury might consider.

The court charged the jury that the plaintiff made a *prima facie* case by showing that he bought the lumber of Howry & Sons, and that he made a demand upon defendant for its possession before bringing suit.   In this the court was in error.   The defendant was in possession of the logs for the purpose of sawing them into lumber. When the lumber was manufactured, the defendant had a lien upon it for the saw bill.   The burden was upon the plaintiff to show that this lien had been terminated.

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.