CONGREGATION B'NAI SHOLOM *v.* MARTIN.

1. SUBSCRIPTIONS — CONSIDERATION — MUTUAL PROMISE AMONG DONORS.

A pledge of future contributions is supported by consideration and binds the pledgor when the fact that the pledge had been made was publicized and provided an incentive for others to pledge contributions even though there was no other consideration for the pledge.

2. SAME — MUTUAL PROMISE AMONG DONORS — RELIANCE — WITHDRAWAL.

A pledge of future contributions that is made public and is used to provide others with an incentive to contribute is binding on

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 50 Am Jur, Subscriptions § 13.
Consideration for subscription agreements. 38 ALR 868, s. 95 ALR 1305, 115 ALR 589, 151 ALR 1238.
[3, 6] 50 Am Jur, Subscriptions § 4.
[4] 22 Am Jur 2d, Damages § 188.
[5] 45 Am Jur, Religious Societies § 40 *et seq.*

the donor under the theory of mutual promise among donors even though the pledgor tries to withdraw the pledge before the donee institution acts in reliance on having the pledge.

3. SAME—SUFFICIENCY OF DOCUMENTS TO CONSTITUTE A CONTRACT.
   A signed pledge card containing wording relative to welcoming the privilege of subscribing constitutes a valid contract if it is shown that this was the intent of the signer of the pledge card.

4. INTEREST—DAMAGES FOR BREACH—CONTRACTS.
   It is within the discretion of the trial court to award interest on a pledge that is in default if it is found that the pledge constituted a contract, and interest should be allowed from the date of default.

5. RELIGIOUS SOCIETIES—CONTRACTS—JEWISH COURT.
   The ruling of the trial court that it is not necessary for the parties to a dispute within a synagogue to take the dispute to a Jewish court before they come to a civil court even though Jewish law is to the contrary will be upheld absent a definitive showing that both parties were familiar with this facet of the Jewish law.

6. CONTRACTS — PLEADING — AMENDMENT — SUBSCRIPTIONS — RELIGIOUS SOCIETIES.
   Amendment of answer in action to collect a subscription to a religious building fund denying that a signed pledge supported by consideration of mutual promises of donors is a legal obligation and to assert that by the law and custom of the religion of the parties it is only a moral obligation *held*, properly denied where the pledge cards used are worded appropriately to create a legal rather than a moral obligation.

Appeal from Berrien, Hadsell (Philip A.), J. Submitted Division 3 February 6, 1968, at Grand Rapids. (Docket No. 3,506.) Decided April 25, 1968. Rehearing denied June 24, 1968. Leave to appeal granted September 30, 1968. See 381 Mich 780.

Complaint by Congregation B'nai Sholom, a Michigan ecclesiastical corporation, against Morris Martin, Irving Martin, Jack Martin, and Bessie Martin

Steinberg for breach of contract. Plaintiff's motion for summary judgment against Morris Martin granted. Defendant appeals. Affirmed.

*Butzbaugh & Page,* for plaintiff.

*Tat Parish,* for defendant.

FITZGERALD, P. J.   The Congregation B'nai Sholom, in the city of Benton Harbor, had planned for some time to construct a new synagogue in that city and in April, 1959, entered into a contract with a professional fund raiser, Ira J. Miller, to direct a campaign to raise the necessary funds. He was to be paid $4,000 for this service.

Chairman of the building committee for the congregation was defendant Morris Martin, who assumed the post in January, 1959. He and Miller worked together in organizing and conducting the fund raising campaign and, among other acts, went to a local bank where they discussed the synagogue building program, seeking to determine if signed pledges, which would be sought in the campaign, could be used to secure a loan for construction.

As the campaign got under way, Mr. Miller suggested to defendant Morris Martin that large pledges would be an inducement and inspiration to members of the congregation to give generously toward the new building. The upshot of the matter was that defendant Morris Martin announced that the Martin family, being represented by himself, would pledge the sum of $25,000. Pledge cards signed by defendant Morris Martin, his 2 brothers, Jack and Irving Martin, and a pledge card for his mother, signed "Bessie Martin Steinberg" by Morris Martin, were turned in to the fund raising campaign. The words, "total donation $25,000" were appended to the pledge

cards on a slip of paper attached thereto and "Martin family" was written on each card.

The fund raising campaign continued successfully and by June of 1959, 102 pledges had been turned in, utilizing the same form of pledge card, for a total subscription of $216,975.

Something went awry during the course of the campaign between the Martin family and the congregation, and it is the family's contention that they withdrew their purported $25,000 pledge on October 29, 1959, and again on November 8, 1959, stressing that this was before the congregation had entered into building contracts, borrowed money, or created any reliance on their purported pledge, thereby absolving themselves of any responsibility to pay the $25,000 pledge.

The synagogue was built in the ensuing months at a cost of more than $190,000.

The Martins' purported pledge, unpaid, is the subject of this action. In December of 1962, the congregation brought suit against the 4 defendants, alleging breach of their agreement to pay the sum of $25,000. As the months rolled by, numerous amendments and answers were filed relative to the action, several revolving around the question of the authority of defendant Morris Martin to sign the name of his mother to the one pledge card. An amendment to the *ad damnum* clause was granted in 1965 by virtue of the fact that the full sum of $25,-000 had then become due, the 5-year period over which it was to have been paid having elapsed. During 1965, 2 motions for leave to amend defendants' answer were filed, first alleging that the plaintiff had not submitted the case to the religious court of the faith, *Beth Din,* prior to institution of this action, and, further, that under Jewish law a pledge to a synagogue is a moral obligation and not en-

forceable in law.   Both motions to amend were
denied by the court.

Previously, by direction of the court, a motion for
summary judgment[1] against all 4 defendants had
been filed by the plaintiff.   Also at the court's be-
hest, the defendants filed a comparable motion ask-
ing for judgment in their favor.

The trial court rejected the claim of the defend-
ants and entered summary judgment for $25,000
against defendant Morris Martin.   Summary judg-
ment was entered in favor of defendant Bessie
Martin Steinberg and the court further found that
fact issues did exist as to the liability of the remain-
ing 2 brothers, Irving and Jack Martin.

Claim of appeal was filed by defendant Morris
Martin, thereby precipitating a delayed interlocu-
tory appeal by plaintiff as to the summary judg-
ments which were not granted in its favor.   The de-
layed interlocutory appeal was denied by this Court
in 1967 and the appeal of the final judgment is now
before us.

It appears appropriate at this juncture to repro-
duce the opinion on the motions for the summary
judgment which was filed by the trial court, since
reference to the findings therein are raised fre-
quently in the course of the questions presented on
appeal and the case is decided in essence therein.

"The following appears in the pretrial conference
memorandum in this case:

" 'At pretrial the court orders counsel for the par-
ties to file within 30 days motions for summary judg-
ment or accelerated judgment,[2] whichever applies,
for the purpose of determining the legal question as
to whether or not exhibits 1 through 6 constitute a
binding subscription agreement.

---

[1] See GCR 1963, 117.
[2] See GCR 1963, 116.

" 'If, after the hearing of those motions, or either of them, it is determined that a trial of the questions of fact is necessary, the issues for determination by the jury shall be determined.'

"It appears without question from admissions made by defendant Morris Martin and from undenied affidavits filed by plaintiff that defendant Morris Martin will be liable to the plaintiff in the amount of $25,000 unless the proposed amendment to the defendants' answer results in a finding that the contract is unenforceable under the Jewish law, which prohibits this suit.

"It appears without question that defendant Morris Martin delivered exhibits 1 through 6 to the duly authorized agent of the plaintiff at the commencement of the plaintiff's campaign to raise funds to build a new synagogue. It appears conclusively further that this was advertised during the progress of the program to secure other subscriptions. It appears further that this was done after the contract with the fund raiser was entered into. It further appears that defendant Morris Martin was asked to make a considerable contribution for the effect that such amount might have on other contributors. In addition, the amount of the pledge was taken up with the banking institution to secure a construction loan or long-term financing.

"Counsel for defendants contend that Michigan should not follow the rule that subscriptions of other contributors are consideration for the enforcement of defendants' subscription, but should, instead, follow the rule which is described as equitable estoppel, which requires that there be some reliance on the subscriptions 'in that obligations had been incurred, money had been spent and work had been done.' It appears that this is like the rose which would smell as sweet by whatever name it was called.

"The subscription of defendant Morris Martin was used as 'bait' to secure substantial donations from other contributors. The obligation to secure the

services of a fund raiser had already been incurred by plaintiff and the subject matter had been discussed with the bank.

"It appears from allegations of the plaintiff that there can be a question of when, if ever, defendants cancelled their subscription, but the earliest date quoted to the court from the pretrial discovery depositions indicates that it was in the latter part of 1959, which was subsequent to the delivery of the pledge by defendant Morris Martin and the employment of the fund raiser.

"Quoting from the case of *In re Upper Peninsula Development Bureau* (1961), 364 Mich 179, at page 184, the Court says by unanimous decision:

" 'This Court has recognized the rule that mutual promises between subscribers of pledges for a lawful purpose will constitute a consideration therefor.'

"The amount of the pledges submitted by defendant Morris Martin, above referred to, the date that the same would all be due, and the consideration of the subscription are all contained in the exhibits, so that the defendants' contention that the same are not pledges or enforceable contracts must be denied as a matter of law and defendant Morris Martin held responsible therefor. They contain all the necessary elements of a binding contract. This fixes the liability of defendant Morris Martin even though he later attempted cancellation or revocation, as he contends.

"The three male defendants are the sons of the fourth defendant, Bessie Martin Steinberg. It is admitted that defendant Steinberg did not sign, authorize defendant Morris Martin to sign her name, or ratify defendant Morris Martin's action in signing her name. Therefore defendants' motion for entry of a summary judgment in favor of defendant Bessie Martin Steinberg shall be granted. In view of the fact that defendant Morris Martin signed defendant Bessie Martin Steinberg's name without authority or without ratification, costs may be taxed

by defendant Steinberg against defendant Morris Martin.

"The liability of defendants Irving Martin and Jack Martin has not been established as a matter of law. The question of whether they authorized defendant Morris Martin to make the pledge in their names and take the actions which he did in connection therewith is one of fact, at least insofar as the proof offered in connection with the motions for summary judgment are concerned. Consequently, the motion for summary judgment in behalf of plaintiff against these two defendants will be denied, as will the motion of defendants for a summary judgment in their favor be denied.

"This brings up the defendants' last motion for amendment to the pleadings, which, in short, claims that the Jewish law prohibits the institution of this suit prior to submission to a Jewish religious court called 'Beth Din.' In defendants' brief on this subject they state that the authoritative code of Jewish religious law and customs is the Shulhan Arukh. This is quoted as stating that where there is a controversy arising between 'two persons' it should be compromised if possible and if not, should be taken before a Jewish tribunal.

" 'It is forbidden to bring a suit before heathen judges in their courts, even if their decision would be in accordance with the law of Israel. Even if the two litigants are willing to try the case before them, it is forbidden. Even if they made either an oral or a written agreement to that effect, it is of no avail. Whoever takes a case before them, is a godless person, and he is considered as if he had defiled, blasphemed, and rebelled against the Law of Moses, peace be unto him. Even in the case where a man may take the law into his own hands, as will be explained, if it please the Almighty, in paragraph 9, below, yet it is forbidden to do it through a heathen. Even if he does not bring the case before a heathen tribunal, but he forces his opponent through a

heathen, that he go with him before a Jewish court, he deserves to receive a flogging.

" '3. When the heathen are in power, or if the defendant is a hard man, the plaintiff should first summon him to appear before a Jewish court, and on his refusal to do so, the plaintiff should obtain the consent of the Beth Din (Jewish court) and save his property by a suit in a general Court of Law.'

"While it seems extremely doubtful that this quotation states the present law of the Jewish religion or that the defendant Morris Martin or any other subscribers depended on such law to relieve them from responsibility for their contribution in the event they changed their minds, it does raise a question of fact which must be determined by the trier of the facts.

"Although counsel for the parties were requested to brief the court on the effect, if any, which religious law would have on this suit, such was not provided to the court; and as the cause now stands, the judgment against defendant Morris Martin may not be entered until there is a more definite determination regarding the modern Jewish religious law and its effect on this action.

"Dated: November 22, 1965"

The foregoing represents the basic fact situation presented to us and defendant's questions will be considered *in seriatim*. The convoluted questions on appeal must be parsed out for a determination of the issues.

First, and of prime importance to defendant Martin, is the issue of the proper theory upon which a nonbusiness charitable pledge may be enforced. Defendant states that the trial court did not reach this issue, urges a remand for that determination or, in the alternative, that this Court choose between the doctrine of promissory estoppel and the doctrine of mutual promise among donors.

In the trial court's opinion, *supra,* while a choice between these 2 doctrines is not specifically spelled out, little doubt can be left in the mind of the reader that the trial court, while stating that, "This is like the rose which would smell as sweet by whatever name it was called", had little question but that the law of this State in such matters is based on the mutual promise among donors doctrine. The court refers specifically to the case of *In re Upper Peninsula Development Bureau* (1961), 364 Mich 179, in determining which theory of law shall be applied. Defendant points out that the use of the promissory estoppel doctrine has not been readily available to the appellate courts of this State, the term having been first used in 1 Williston, Contracts (1st ed, 1920), § 139, and that few later cases have given the Court a clear-cut opportunity to apply the relatively new doctrine of promissory estoppel. They ask of older cases, "Who can say what would have been the decision of the court had the particular case been supported by argument based upon the doctrine (of promissory estoppel)?" We see little reason, and, indeed, doubt our authority, to overlook the body of Michigan case law built up on the doctrine of mutual promise among donors. Defendant Martin attacks the doctrine of mutual promise among donors as a fiction and an undesirable one at that. We doubt, however, that the case can be carried this far.

An examination of the pledge card reveals the words:

"In consideration of the gift of others, I/we welcome the privilege of subscribing $. . . .  . . . ."

It is elemental that one donor is not likely to give unless other donors give, and bound together as they are, inextricably linked in a project for the

benefit of all of them, they must support one another
rather than be afforded a unilateral opportunity to
withdraw.   For earlier cases on the application of
this doctrine, see *Allen* v. *Duffy* (1880), 43 Mich 1,
*Comstock* v. *Howd* (1887), 15 Mich 237, and *Under-
wood* v. *Waldron* (1863), 12 Mich 73.

The question of a fact issue as to whether defend-
ant withdrew his pledge before plaintiff acted in re-
liance on it fades when a definitive choice of law to
be applied is made.   The large compendium of fac-
tual material, both briefed and in the record, con-
cerning the making of contracts for construction, the
borrowing of money, and the question of reliance, no
longer looms large.   The fact remains that 102
pledges had been garnered during the fund raising
campaign and that 4 months after the campaign con-
cluded defendant unilaterally withdrew a pledge in
excess of 10% of the total goal of the fund raising
campaign.   Clearly such action would create a situ-
ation where a charity would be unable to do things
it would have done had there been no withdrawal.

That the 4 pledge cards and the material paper-
clipped thereto constituted a contract is also in is-
sue.   Defendant makes much of the fact that they
were separate cards and that a scrap of paper with
the words, "Total donation $25,000" was appended.
The trial court found that these cards as a matter
of law were sufficiently complete to form a binding
contract.   Defendant attacks these cards as holding
no words of commitment and that it would be reason-
able for a jury to conclude that wording relative to
welcoming the privilege of subscribing was chosen
to express an intention that the donor was filling a
moral, not legal, obligation only.   We have little
difficulty in deciding that the material turned in by
defendant Morris Martin constituted a valid con-
tract.   No conjecture is necessary to calculate the

intention of defendant Martin in his writings. See
*Interstate Construction Company* v. *U. S. F. & G.
Company* (1919), 207 Mich 265.

Defendant complains likewise of the award of in-
terest at 5% as made by the trial court, pointing out
that nothing indicates the parties intended that de-
linquent pledges would bear interest. Inclusion of
interest at this figure appears to be within the dis-
cretion of the trial court and should be included as
damages in the judgment from June 30, 1964, the
approximate date the contract was in default. See
*Mitchell* v. *Reolds Farms Co.* (1934), 268 Mich 301.

Following the opinion filed by the trial court, *su-
pra,* in which reference is made to defendants' pend-
ing motion for leave to amend based on the ques-
tion of whether the dispute should first have been
submitted to *Beth Din,* the Jewish court, we find
that the record discloses that a second motion made
by defendant for leave to amend was filed less than
a month following the opinion, both motions being
heard by the trial court on December 10, 1965, and
denied. We question whether defendants' motions
were made "at an early procedural stage" as he
claims. Defendant suggests that the utilization of
*Beth Din* is implicit in the contract. What is lack-
ing, however, is a showing that *Beth Din* had ever
been known or used by this particular congregation
or its members. We would require a more definitive
showing that both parties to the contract were fa-
miliar with this particular facet of Jewish law before
we could disagree with the trial court. In *Pennell*
v. *Transportation Co.* (1892), 94 Mich 247, 252, it is
stated:

"In cases where evidence of usage is admissible at
all, it is only on the grounds that the parties who
made the contract are both cognizant of the usage,

and must be presumed to have made their engagements in reference to it."

The record before us discloses no such cognizance. Appellant's first proposed amendment thus did not state a legal defense and there was no abuse of discretion in its refusal.

The second amendment again relied upon Jewish law, custom or tradition, stating that a pledge to a synagogue is a moral obligation and not an enforceable contract. We are impressed by the fact that the form of the pledge cards, worded as are most pledge cards in any fund raising campaign, demonstrate little tendency to create a "moral" obligation rather than a legal obligation. Had there been any desire to create here a moral rather than a legal obligation, it would have been simple to make this fact known to the prospective donors and to so word the pledge card. This amendment, too, was properly denied.

In summation, we find no abuse of discretion on the part of the trial court and that the judgment was properly entered.

Affirmed. Costs to appellee.

J. H. GILLIS and BOWLES, JJ., concurred.