CONGREGATION B'NAI SHOLOM *v.* MARTIN.

1. SUBSCRIPTIONS—MOTIONS—AMENDMENT OF PLEADING—AFFIRMATIVE DEFENSE—PLEDGES—CUSTOMS AND USAGES.

   Denial of defendant's motion to amend his answer, in an action on purported subscription agreement, *held*, error, where amendment was offered so as to assert the affirmative defense that pledges to a Jewish synagogue have been held by Jewish law, custom, tradition, and usage to be only moral obligations and not legally enforceable contracts, and defendant's motion to amend was supported by the affidavit of a rabbi, which raised a question of fact as to Jewish custom that might be controlling upon the parties.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 3, 4] 41 Am Jur, Pleading § 288 *et seq.*
[2, 6] 21 Am Jur 2d, Customs and Usages § 23 *et seq.*
[5] 41 Am Jur, Pleading § 340 *et seq.*
[7] 17 Am Jur 2d, Contracts § 104 *et seq.*
   50 Am Jur, Subscriptions § 10 *et seq.*

2. CONTRACTS—CUSTOMS AND USAGES—PLEDGES—JEWISH RELIGION.

Custom cannot change a definite contract, but where defendant signed his name to a pledge card which was not filled out as to amount and which did not commit him to a promise to pay, there was not a definite contract; hence, defendant should have been permitted to assert as a defense that the custom of the Jewish religion requires disputes between the synagogue and its members on religious matters to be resolved according to Jewish law.

3. PLEADING—AMENDMENT—COURT RULES.

Parties are to be given leave to amend their pleadings where justice so requires (GCR 1963, 117.3, 118.1).

4. SAME—AMENDMENT—DEFENSES—SUMMARY JUDGMENT.

Defendants should be allowed to amend their answer to assert any defense they have, before judgment by the court, where the rights of the parties are being tested on motions for summary judgment filed at behest of the trial judge, not at the election of the parties (GCR 1963, 117.3, 118.1).

5. SUBSCRIPTIONS—SUMMARY JUDGMENT—QUESTION OF FACT—JOINT AND SEVERAL LIABILITY.

Summary judgment should not be granted a plaintiff that claims 3 defendants are liable jointly and severally on a subscription agreement, where plaintiff concedes there are questions of fact as to the liability of 2 of the defendants, for the joint and several liability can only be determined by an adjudication of the claims against all of the defendants (GCR 1963, 117.3, 118.1).

6. CUSTOMS AND USAGES—DEFENSES—SUBSCRIPTIONS.

Custom and usage may be asserted as a defense to an action on a subscription agreement and may be binding if certain, definite, uniform, and notorious.

7. SUBSCRIPTIONS—PLEDGES—CONSIDERATION—MUTUAL PROMISES.

Mutual promises between subscribers of pledges for a lawful purpose constitute consideration for the subscriptions.

Appeal from Court of Appeals, Division 3, Fitzgerald, P. J., and J. H. Gillis and Bowles, JJ., affirming Berrien, Hadsell (Philip A.), J. Submitted October 8, 1969. (Calendar No. 5, Docket No. 52,117.) Decided December 1, 1969.

11 Mich App 261, reversed.

Complaint by Congregation B'nai Sholom, a Michigan ecclesiastical corporation, against Morris Martin, Irving Martin, Jack Martin, and Bessie Martin Steinberg for breach of contract. Plaintiff's motion for summary judgment against Morris Martin granted. Defendant Morris Martin appealed to the Court of Appeals. Affirmed. Defendant Morris Martin appeals. Reversed and remanded for trial.

*Elden W. Butzbaugh,* for plaintiff.

*Dykema, Wheat, Spencer, Goodnow & Trigg* and *Tat Parish,* for defendant.

ADAMS, J.

## FACTS.

In January of 1959, defendant Morris Martin became chairman of the Synagogue Building Committee. On April 22, 1959, plaintiff contracted with Ira J. Miller, a professional fund raiser, to assist in raising funds to build a new synagogue. Miller commenced his activities on May 11, 1959. One of his activities was to confer with defendant Morris Martin about a gift to the synagogue by the Martin family. Miller and Morris Martin conferred with a bank with regard to the building program of the Congregation. Following discussions between Miller and Morris Martin, Martin called Miller and advised him that the Martin family would subscribe $25,000.

On or about June 1, 1959, Morris Martin delivered to plaintiff's campaign office four partially filled-in pledge cards. The first three were signed, respec-

tively, by Irving Martin, Jack Martin, and Morris Martin. The fourth was signed by Morris Martin in the name of Bessie Martin Steinberg. The four pledge cards were not filled out as to amount. Morris Martin wrote the words, "Total Donation $25,000.00" on an attached scrap of paper. (The Morris Martin pledge card and the scrap of paper are reproduced herewith.)

During the months of May, 1959 and June, 1959, as a result of the fund raising campaign, plaintiff received 102 pledges, each in the same printed form as the one executed by Morris Martin, aggregating $216,975.

Later in the year 1959, disputes arose between Morris Martin, chairman of the Synagogue Building Committee, and other members of the Congregation. On October 29, 1959, and again on November 8, 1959, Morris Martin attempted to withdraw the pledge. On these dates plaintiff had entered into no contracts for the construction of the synagogue. It has now been built at a cost in excess of $190,000.

On December 20, 1962, plaintiff, a nonprofit corporation, brought suit against Morris Martin, Irving Martin, Jack Martin, and Bessie Martin Steinberg, on the purported subscription agreement claiming that the defendants jointly and severally agreed to pay to plaintiff the sum of $25,000 toward the erection of the synagogue.

At a pretrial conference on March 10, 1965, the trial judge ordered the parties to file motions for summary judgment or accelerated judgment. On November 17, 1965, the defendants filed a motion for leave to amend their answer. The proposed amendment would have added an affirmative defense to the effect that:

"Jewish religious law and the custom and usage of plaintiff synagogue prohibits the institution of a lawsuit in a nonreligious court before resort is had to *Beth Din,* or religious courts. There has been no effort on the part of plaintiff to seek relief in a *Beth Din.* Whether or not the cards on which plaintiff relies would otherwise form a legally binding contract, it was the intent of the parties that the Jewish law should govern the transaction. Since the Jewish law prohibits the institution of this suit,

the parties did not intend to enter into a contract which is legally enforceable under Michigan law."

On November 22, 1965, the trial judge filed an opinion on the motions of plaintiff and defendants for summary judgment. Bessie Martin Steinberg was granted a summary judgment upon determination that Morris Martin signed her name without authority or ratification. Summary judgment was denied as to Irving Martin and Jack Martin since the question as to whether they authorized Morris Martin to make the pledge in their names and take the actions which he did in connection therewith was held to be one of fact.

With regard to Morris Martin, the trial judge stated:

"Although counsel for the parties were requested to brief the court on the effect, if any, which religious law would have on this suit, such was not provided to the court; and as the cause now stands, the judgment against defendant Morris Martin may not be entered until there is a more definite determination regarding the modern Jewish religious law and its effect on this action."

On December 9, 1965, a second motion for leave to amend answer was filed by the defendants in order that a further affirmative defense might be asserted to the effect that "Jewish law, custom, tradition and usages for over a thousand years has been that pledges to a synagogue are moral obligations only and may not be legally enforceable contracts."

The defendants' motions for leave to amend were supported by the affidavit of a Rabbi Dr. Bernard D. Perlow, a rabbi for 25 years and a scholar. After stating his qualifications as an expert witness, he gave his opinion as follows:

"5. That the religious customs, practices and laws binding on all Jews are codified in the work known as the Shulchan Aruch; that this code is generally regarded as binding as a matter of religious faith by both Orthodox and Conservative Jews; that there is no real distinction between the moral and ethical obligations of the Orthodox and Conservative Jews; that there is only a distinction in certain synagogue rituals; that although the synagogue now known as Congregation B'Nai Sholom is presently classified under the term Conservative, it is important to point out that such classification does not in any way lessen the binding obligation to obey Jewish religious laws as codified in the Shulchan Aruch in matters of conduct and social relations among Jews; that the term Conservative indicates the adoption of certain minor changes that are formalistic, such as mixed seating in the synagogue; the introduction of English in the liturgy and the like; that it is significant that the Orthodox practices and customs which are contained in the copy of the constitution of the synagogue, as submitted to this deponent, shows that numerous Orthodox customs and traditions are still embodied and are obligatory on B'Nai Sholom Synagogue, such as the requirement that the Torah shall not be taken out on Friday night or any other holiday night, with the exception of Simchos Torah and Yom Kippur; that the kitchen in the synagogue is to be maintained strictly kosher; that the wearing of the prayer shawls on Saturday and other holidays are mandatory; that no organ shall be installed in the synagogue proper and that any choir that is used shall be composed of persons of the Jewish faith; that these are clear indications that the said synagogue intended to be bound by Jewish custom, tradition and practices.

"6. That in the opinion of this deponent, the Shulchan Aruch, as well as the custom and tradition for more than a thousand years, prohibits the bringing of a suit in the civil courts of any State by a

synagogue against any of its members or vice versa
and is contrary to Jewish law and is prohibited;
that any such civil controversy must be first brought
before the Jewish religious court known as the Beth
Din (a Jewish rabbinical court); that under Jewish
law, matters of charity to the synagogue go to the
heart of the Jewish religion; that a charitable con-
tribution to a synagogue is considered a religious
matter by and between the synagogue and the mem-
ber; that for a synagogue to file a suit against one
of its members upon an alleged charitable contribu-
tion without submitting it to a Beth Din is what
is known in Jewish law as a 'Chillul Hashem' which
is a profanation of God's name and such action is
such a grave sin in Jewish law, that it warrants ex-
communication; that historically, pledges to a syna-
gogue were always considered and are still con-
sidered as moral obligations and not the subject
of a lawsuit; that since Jewish law does not even
permit one Jewish member of a synagogue to sue
another Jewish member on civil matters unless it
is first submitted to a Beth Din, *a fortiori,* in case
of a purely religious controversy that is involved
in this case, it is even a greater violation of Jewish
law; indeed it has been uniformly held that to take
a case of this character involving Jewish charity,
Jewish religion and the integrity of the synagogue
and its members before a civil court is scandalous
and disgraceful and subjects the moving party to
excommunication (Responsa of Rabbi Jacob Tam
[11th century], grandson of the famous Talmudic
authority Rashi, Responsa of Rabbi Mayer of Rut-
tenberg [14th century] and all Rabbinic Responsa
to Jewish history).

"7. That it is expressly stated in Hyman E.
Goldine's translation of Rabbi Solomon Ganzfried's
'Code of Jewish Law, Kidzur Shulchan Aruch'
published in New York City by the Hebrew Pub-
lishing Company in 1961, volume 4, page 67, that it

is forbidden to bring a suit in the civil courts even if their decision would be in accordance with the law of Israel; that even if the two litigants are willing to try the case before such a court, it is forbidden; that even if they make an oral or a written agreement to that effect it is of no avail; that whoever takes a case against another Jew involving religious matters, is a Godless person and he has violated and defiled the law of Moses; that throughout the Shulchan Aruch, it is repeatedly stated that the Beth Din (Jewish rabbinical court) is the proper and only tribunal to hear controversies between a synagogue and its members; that it is especially and flagrantly contrary to Jewish law for a synagogue to sue in a civil court the chairman of its building committee who had apparently been one of the pillars of the synagogue for many years; that the whole concept of Jewish charity, Jewish obligation to the synagogue and Jewish support for the synagogue, would be greatly endangered, if not destroyed, if a synagogue would be permitted to go to civil courts to enforce an obligation upon an alleged pledge by its members; that more is at stake than the contractual relationship between synagogue and its members in this litigation; that the integrity, the morality and the tradition of Jewish support of the synagogue predicated upon the moral law, is being attacked.

"8. Therefore in the opinion of this deponent, the synagogue had no right under Jewish law, which is controlling and binding upon the parties, to institute this suit."

On December 10, 1965, the trial judge denied defendants' two motions for leave to amend answer. Motion to reconsider was denied on April 21, 1966. On August 24, 1966, the trial judge issued a supplemental opinion in which he granted a summary judgment in favor of plaintiff against defendant Morris

Martin for the sum of $25,000, plus interest at 5%
from June 30, 1964; Morris Martin was granted the
right within 30 days to introduce a third-party ac-
tion for contribution from defendants Jack Martin
and Irving Martin. Appeal was taken from the final
judgment in favor of plaintiff and against Morris
Martin to the Court of Appeals. That Court af-
firmed the trial judge. (11 Mich App 261.) We
granted leave (381 Mich 780).

## RIGHT TO AMEND ON MOTION FOR
## SUMMARY JUDGMENT.

The trial judge erred in denying defendants'
motions for leave to amend for the reason that the
affidavit of Rabbi Dr. Bernard D. Perlow raised a
question of fact as to Jewish custom which may be
controlling upon the parties.

Custom cannot change a definite contract. *Harvey
v. Cady* (1855), 3 Mich 431; *Erwin v. Clark* (1864),
13 Mich 10; *Advertiser and Tribune Company v.
City of Detroit* (1880), 43 Mich 116; *Ledyard v.
Hibbard* (1882), 48 Mich 421 (42 Am Rep 474);
*Greenstine v. Borchard* (1883), 50 Mich 434 (45 Am
Rep 51); *Van Hoesen v. Cameron* (1884), 54 Mich
609; *Lamb v. Henderson* (1886), 63 Mich 302;
*Meloche v. Chicago, M. & St. P. R. Co.* (1898), 116
Mich 69; *Germain v. Central Lumber Co.* (1898),
116 Mich 245; *Hanna v. Smith* (1913), 173 Mich 483;
*Fort Pitt Malleable Iron Co. v. Detroit Steel Prod-
ucts Co.* (1932), 260 Mich 683; *Munro v. Boston
Insurance Company* (1963), 370 Mich 604.

The pledge cards of defendants in this case were
not filled out as to amount and the printed portion
did not commit the signer to a promise to pay. The
nature of the agreement was such as not to bring it
within the rule of the foregoing cases. Defendants

should have been permitted to assert, as a defense, their claim as to the custom of their religion which requires disputes between the synagogue and its members over religious matters to be resolved according to Jewish law and to prove, if they can, that the some 102 other subscribers in signing their pledge cards contracted with reference to it.

GCR 1963, 117 deals with summary judgments. GCR 1963, 117.3 in part provides:

"Each party shall be given opportunity to amend his pleadings as provided by Rule 118 unless the evidence then before the court shows amendment would not be justified."

GCR 1963, 118 deals with amended and supplemental pleadings and provides under 118.1 that:

"Leave [to amend] shall be freely given when justice so requires."

In *LaBar* v. *Cooper* (1965), 376 Mich 401, we dealt with the right of plaintiffs to amend to set forth a different theory with regard to their claimed causes of action. We stressed that the right to amend should be freely given and that a trial judge should make findings upon which he exercises his discretion to grant or deny leave to amend. Nothing appears in the record before us in this case to warrant the trial judge's denial of the motion. When the rights of the parties are being tested on motions for summary judgment filed, not at the election of the parties themselves but at the behest of the trial judge, a defendant should most certainly be allowed to amend to assert any defense he may have before the court has ruled.

### THE MOTIONS FOR SUMMARY JUDGMENT.

The action which now pends is against Irving Martin, Jack Martin and Morris Martin who, it is claimed, are jointly and severally liable on the subscription agreement. The question of their joint or several liability can only be determined by an adjudication of the claims against all of the defendants. It is conceded that there are questions of fact as to the liability of Irving Martin and Jack Martin. Consequently, for this reason, as well as because the question of custom is one of fact as the case now stands, summary judgment should not have been granted except in connection with the claim against Bessie Martin Steinberg.

### THE ISSUES UPON REMAND.

It is not possible for this Court to foresee what further developments may occur in this case upon remand. We make the following comments, however, for the guidance of the trial judge as to issues which may require decision.

### 1. Custom or Usage.

We have held the defense of custom or usage may be asserted. Custom may be binding if certain, definite, uniform, and notorious. In addition to the discussion of custom contained in many of the cases already cited in this opinion on the point that definite and complete contracts may not be altered by custom, the discussions and holdings in the following Michigan cases are pertinent: *Hutchings* v. *Ladd* (1868), 16 Mich 493; *Van Hoesen* v. *Cameron* (1884), *supra; Lamb* v. *Henderson* (1886), *supra; Stringfield* v. *Vivian* (1886), 63 Mich 681; *Pennell* v. *Delta Transportation Company* (1892), 94 Mich

247; *Eaton* v. *Gladwell* (1896), 108 Mich 678; *Kenyon* v. *Charlevoix Improvement Co.* (1903), 135 Mich 103; *Karwick* v. *Pickands* (1912), 171 Mich 463; *Welling* v. *Kalamazoo Lumber Co.* (1913), 177 Mich 340; *People, for the Use of New Jersey Terra Cotta Co.,* v. *Traves* (1915), 188 Mich 415; *Tatro* v. *Baker-Fisk-Hugill Co.* (1921), 215 Mich 623; *Chaney* v. *Lake Drive Garage* (1930), 252 Mich 412; *Redding* v. *Snyder* (1958), 352 Mich 241.

## 2. Consideration for Subscription Agreements.

Defendant contends that the doctrine of promissory estoppel should be applied in the circumstances of this case, offering American Law Institute Restatement of Contracts, § 90 (1932), as a description of the doctrine:

"A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

Defendant contends that since he withdrew his promise before construction of the synagogue, he should be released from that promise.

In *In re Upper Peninsula Development Bureau* (1961), 364 Mich 179, this Court stated (p 184):

"This Court has recognized the rule that mutual promises between subscribers of pledges for a lawful purpose will constitute a consideration therefor."

The Court quoted from *Waters* v. *Union Trust Co.* (1902), 129 Mich 640, which involved an attempt to collect a subscription to a church building fund. In that case the reason for the rule and the Michigan authorities are set forth.

The reason for the rule was examined in *More Game Birds in America, Inc., v. Boettger* (1940), 125 NJL 97 (14 A2d 778, 780, 781):

"It is conceded that in addition to defendant's subscription, plaintiff obtained subscriptions from others in very substantial amounts. Defendant and the other subscribers thus manifested their intention to participate in a charitable undertaking which all, as one, without hope of pecuniary gain, set out to accomplish. Let us see what happened in the instant case. Defendant caused his obligation properly to come into plaintiff's hands, and plaintiff accepted it and acknowledged receipt thereof. Defendant then paid a substantial part of his obligation to plaintiff which thereupon proceeded, and has since continued, to carry out its objectives which are in fact defendant's objectives, the subscribers' objectives. Now it seems to us, apart from the fine technique as to acceptance and consideration, both of which we hold sufficiently appear here, that in principle the issue involved is necessarily of great concern to the public welfare. It is a question of public policy, public welfare. Such a sound policy indeed requires that one who, as defendant here, has voluntarily made a valid and binding subscription to a charity of his choice should not be permitted to evade it."

We reaffirm our previous holdings that in subscription agreement cases the mutual promises between subscribers of pledges for a lawful purpose will constitute a consideration therefor.

Reversed and remanded for further proceedings in accordance with this opinion. Costs to appellant.

T. E. BRENNAN, C. J., and DETHMERS, KELLY, BLACK, T. M. KAVANAGH, and T. G. KAVANAGH, JJ., concurred.